[No. A068199. First Dist., Div. Three. Feb. 23, 1996.]

SHELLEY CHASE et al., Plaintiffs and Respondents, v.
BLUE CROSS OF CALIFORNIA et al., Defendants and Appellants.

**COUNSEL**

James H. Fleming, Seyfarth, Shaw, Fairweather & Geraldson and Randal L. Golden for Defendants and Appellants.

Gwilliam, Ivary, Chiosso, Cavalli & Brewer, Eric H. Ivary, Steven J. Brewer and Marguerite E. Meade for Plaintiffs and Respondents.

**OPINION**

**CORRIGAN, J.**—The court below refused to order arbitration despite an arbitration agreement in an insurance contract between the parties. Blue

Cross of California (Blue Cross) contends the court misapplied governing state case law in denying arbitration. Alternatively, Blue Cross argues state case law is preempted to the extent it conflicts with the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.). We agree with Blue Cross's first contention. Consequently, we reverse and remand for reconsideration under the proper state law standard. Additionally, we hold state law on this subject is not preempted by the FAA.

*Facts*

In 1988, Shelley Chase[1] contracted with Blue Cross for medical insurance. The coverage was obtained through her employment and included her dependents. Her benefit plan provided for mandatory binding arbitration in the event of a dispute. The arbitration condition was set out in the benefits handbook provided to Chase.[2]

In July 1991, Chase's son, Micah, was diagnosed with acute myelocytic leukemia and thereafter received extensive medical care. Between September 9, 1991, and August 30, 1994, Chase received many "explanation of benefits" forms from Blue Cross, along with payment of benefits for Micah's treatment. The arbitration requirement and procedures were printed on the reverse side of these forms.[3] In 10 other instances between October 30, 1993, and January 8, 1994, Blue Cross sent Chase "form reject letters" explaining partial or complete denial of coverage for some aspect of Micah's

---

[1]Plaintiffs are Shelley Chase and her husband, Del. Because insurance coverage was secured through Shelley Chase's employment, we refer only to her in our discussion of the facts.

[2]On this point, the handbook read: "BINDING ARBITRATION [¶] A. Any dispute between the Member and Blue Cross regarding the decision of Blue Cross must be submitted to binding arbitration if the amount in dispute exceeds the jurisdictional limits of the small claims court. This arbitration is begun by the Member making written demand on Blue Cross. [¶] B. This arbitration will be held before a designated neutral arbitrator appointed by the county medical association of the county in which the services were provided. If the county medical association declines or is unable to appoint an arbitrator, the arbitration will be conducted according to the rules of the American Arbitration Association. [¶] C. Any dispute regarding a claim for damages within the jurisdictional limits of the small claims court will be resolved in such court. [¶] D. THE ARBITRATION FINDINGS WILL BE FINAL AND BINDING."

[3]The arbitration section was entitled "DESCRIPTION OF CLAIMS REVIEW PROCEDURE" and read: "If your claim, or any part thereof, is denied, we will provide you with a written notification explaining and/or describing the reasons for the denial. However, if you have reason to question the correctness of that decision, contact your dedicated processing unit for clarification and/or review. If the need arises to appeal the decision of that review, an appeal procedure is available upon request. The process is invoked by your submission of a written request. [¶] Your Blue Cross agreement or certificate contains an arbitration clause. Disagreements between you and Blue Cross which exceed small claims court jurisdictional limits will be settled through arbitration. To initiate arbitration, a written request must be submitted to your dedicated processing unit who will provide you with information to initiate arbitration."

care. These letters also included a statement of the arbitration condition. The record contains an example of one form reject letter sent to Chase on July 28, 1993, containing the arbitration provision in the main text.[4]

In March 1993, Micah was awaiting a matching bone marrow donor when his condition deteriorated. His physician determined that Micah could not wait for a matching donor but would have to receive bone marrow from a parent. This procedure, known as a haploidentical bone marrow transplant, was not performed in California but at a cancer center in Texas.

Chase's benefit plan did not include coverage for investigative procedures, which are defined in the handbook as "those that have progressed to limited use on humans, but which are not widely accepted as proven and effective procedures within the organized medical community." On July 17, 1993, Blue Cross sent Chase a letter, denying coverage for the anticipated transplant on the basis that the procedure was investigative.[5] This rejection letter did not reiterate the arbitration condition but did outline the available internal review process by which Chase could request reconsideration in writing. The letter also encouraged Chase to "refer to [her] benefit agreement for details about benefits, limitations and exclusions, as well as any waivers that may apply." After receiving the letter, Chase contacted Blue Cross by phone. She was again told she could make a written request for reconsideration, but no mention was made of the formal arbitration procedure. On July 30, Chase sent Blue Cross a letter requesting reconsideration of the denial. Although Micah received the transplant on that same date, he succumbed to the disease a month later.

For several months, Chase heard nothing from Blue Cross, so she contacted the State Department of Insurance. After the Department of Insurance made inquiries of Blue Cross about the claim, Chase received a letter from Blue Cross dated November 9, 1993, again denying coverage on the same basis cited previously. This letter did not mention the arbitration condition. On January 31, 1994, Blue Cross partially denied another claim regarding Micah's care. This claim did not involve the transplant itself. The letter of partial denial did refer to the option for arbitration.

---

[4]The text of the letter reads: "We have received the above-listed claim. [¶] Your Blue Cross Agreement does not include benefits for the type of expense(s) billed on this claim. We regret, therefore, that no payment can be made for these charges. [¶] Your Blue Cross Agreement contains an arbitration clause. Disagreements between you and Blue Cross which exceed small claims court jurisdictional limits will be settled through arbitration. To initiate arbitration, a written request must be submitted to your dedicated processing unit who will provide you with information to initiate arbitration. [¶] If you have any questions, please contact us at the telephone number listed below."

[5]A similar letter was sent to the cancer center in Texas on July 14.

Chase filed a complaint for damages on June 22, 1994. Blue Cross petitioned for an order compelling arbitration, which was denied by the superior court on October 4. The court found that, although the arbitration provision was "clear, plain, conspicuous, and unambiguous," Blue Cross had "intentionally waived and relinquished its right to compel arbitration" because "communications between Blue Cross and Shelley Chase did not mention the arbitration provision."

## Discussion

### I. Loss of the Right of Arbitration Under State Law

At issue here is the extent of the rule articulated in *Davis* v. *Blue Cross of Northern California* (1979) 25 Cal.3d 418 [158 Cal.Rptr. 828, 600 P.2d 1060] (*Davis*) and *Sarchett* v. *Blue Shield of California* (1987) 43 Cal.3d 1 [233 Cal.Rptr. 76, 729 P.2d 267] (*Sarchett*) that precludes an insurer from invoking an arbitration provision when it has failed to adequately inform the insured of that provision. Chase essentially alleges Blue Cross acted in bad faith or, alternatively, breached the covenant of good faith and fair dealing by failing to properly inform her of the arbitration provision. According to Chase, *Davis* and *Sarchett* compel the conclusion that Blue Cross cannot now invoke arbitration.

The trial court agreed with Chase, concluding that Blue Cross "waived and relinquished" its right to compel arbitration because some correspondence regarding the contested claim did not contain a notice of arbitration, even though clear reference to arbitration was made in the benefits handbook and in numerous other written notices relating to the same illness. Consequently, the trial court limited its consideration to isolated facets of the company's extended contact with the insured. We hold that, under *Davis* and *Sarchett*, a finding of relinquishment can be reached only after consideration of all relevant circumstances and requires a determination of bad faith conduct by the insurer.

### A. Loss of a Contractual Right by an Insurer

It is important to begin by distinguishing the different theories under which an insurer may lose a contractual right. Here, Chase does not allege that Blue Cross "waived" its right to arbitration, in the sense that it intentionally relinquished a known right. Nor does Chase allege that she detrimentally relied upon Blue Cross's actions such that the insurer is estopped from invoking arbitration. Rather, her claim is properly understood to be that Blue Cross's breach of the duty of good faith results in its forfeiture of the right of arbitration.

While courts often speak of the insurer "waiving" its right to compel arbitration in such situations, we understand *Davis* and *Sarchett* as cases in which the insurer "forfeited" rather than "waived" the right to arbitration. In the law, "forfeiture" is defined as "A deprivation or destruction of a right in consequence of the nonperformance of some obligation or condition." (Black's Law Dict. (6th ed. 1990) p. 650.) As we explain below, forfeiture of the right to arbitration occurs when the insurer breaches the duty of good faith and fair dealing by engaging in bad faith conduct designed to mislead the insured.[6]

In *Platt Pacific, Inc.* v. *Andelson* (1993) 6 Cal.4th 307, 310 [24 Cal.Rptr.2d 597, 862 P.2d 158], the Supreme Court addressed the question: "May a party that did not demand arbitration within the time specified in an agreement to arbitrate nevertheless compel arbitration on the ground that it did not intend to relinquish the right to arbitrate the dispute when it failed to make a timely demand?" There, the plaintiffs claimed the Court of Appeal erred in finding they had "waived" their right to arbitrate by failing to make a timely demand. (*Id.* at p. 313.) In upholding the Court of Appeal's decision, Justice Kennard detailed the history of the "waiver" concept in such circumstances: "[T]he courts of this state have held that the failure to make a timely demand for arbitration results in a 'waiver' of the right to compel arbitration. [Citations.] It is true that, as plaintiffs point out, some decisions have defined the term 'waiver' as the voluntary relinquishment of a known right. [Citations.] Contrary to plaintiffs' assertion, however, none of the cases concerning the failure to timely demand arbitration have used the word 'waiver' to mean voluntary relinquishment of a known right. [¶] Federal as well as state courts have used the term 'waiver' to refer to a number of different concepts. [Citations.] Generally, 'waiver' denotes the voluntary relinquishment of a known right. But it can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to abandon or relinquish the right. [Citations.] The term 'waiver' has also been used as a shorthand statement for the conclusion that a contractual right to arbitration has been lost. [Citation.] [¶] The confusion engendered by the multiple meanings of 'waiver' is not new. . . . [¶] We have examined the California decisions stating that a party may 'waive' its right to arbitrate by failing to timely demand arbitration. We

---

[6]It bears noting that the concept of forfeiture here is counterintuitive. A subscriber and a company contract for insurance coverage, and that contract includes compulsory arbitration. At some point, there is a disagreement between the parties over coverage. No arbitration takes place, and the subscriber sues. The company seeks to compel arbitration, but the subscriber objects, complaining the company's conduct deprived the subscriber of the opportunity for the very arbitration into which the company now proposes to enter. Rather than dwell on the analytical challenges, we observe only that we are bound by *Davis* and *Sarchett*. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937].)

conclude that those decisions use the word 'waiver' in the sense of the loss or *forfeiture* of a right resulting from failure to perform a required act." (*Id.* at pp. 314-315, italics added.)

More recently, in *Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*), the Supreme Court addressed the question whether an insurer can later rely upon policy exclusions it fails to cite in its initial letter denying coverage. There, the policyholders first alleged the insurer "waived" those exclusions. The court concluded otherwise: "Case law is clear that ' "[w]aiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.] The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' [Citations.] The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right. [Citation.] [¶] . . . California courts have applied the general rule that waiver requires the insurer to intentionally relinquish its right to deny coverage and that a denial of coverage on one ground does not, absent clear and convincing evidence to suggest otherwise, impliedly waive grounds not stated in the denial. [Citations.]" (*Id.* at pp. 31-32.)

Second, the policyholders in *Waller* claimed the insurer should be estopped from raising any exclusion not mentioned in the initial denial letter. The court rejected this claim as well because the policyholders had not shown they had relied on the letter's failure to mention the ultimately successful exclusion: ". . . proof of estoppel requires a showing of detrimental reliance by the injured party. [Citations.]" (*Waller, supra,* 11 Cal.4th at p. 34.)

*Intel Corp.* v. *Hartford Acc. & Indem. Co.* (9th Cir. 1991) 952 F.2d 1551 presented the same legal issue later resolved in *Waller.* There, in analyzing California law, the federal circuit court rejected an automatic waiver rule: "There is no evidence Hartford attempted to 'sandbag' or mislead Intel with the belated announcement of a new grounds for denial of coverage, nor has Intel shown it was prejudiced by the failure to mention [the alternate exclusion]." (*Id.* at p. 1561.) The court noted, "In the insurance context . . . the distinction between waiver and estoppel has been blurred. In cases where waiver has been found, there is generally some element of *misconduct* by the insurer or detrimental reliance by the insured." (*Id.* at p. 1559, fn. omitted, italics added.) The *Intel* court's notion that insurer misconduct could lead to

loss of a contractual right was incorporated by the *Waller* court in dictum. (See *Waller, supra,* 11 Cal.4th at p. 33.)[7]

▮ Thus, it appears an insurer may lose a contractual right by: (1) waiver, an intentional relinquishment of a known right demonstrated expressly or implicitly; (2) estoppel, conduct by the insurer that reasonably causes an insured to rely to his detriment; or (3) forfeiture, the assessment of a penalty against the insurer for either misconduct or failure to perform an obligation under the contract. Because Chase alleges Blue Cross forfeited its right to arbitration, we turn to a discussion of that particular theory.

### B. *Forfeiture of the Right to Arbitrate*

As articulated by the Supreme Court, ". . . arbitration has become an accepted and favored method of resolving disputes [citations], praised by the courts as an expeditious and economical method of relieving overburdened civil calendars [citations]." (*Madden* v. *Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, 706-707 [131 Cal.Rptr. 882, 552 P.2d 1178].) "A written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (Code Civ. Proc., § 1281.) ▮ As with any other contractual right, the right to arbitration may be waived. (Code Civ. Proc., § 1281.2, subd. (a).)[8] However, "'. . . the burden of proof is "heavy" and rests on the party seeking to establish waiver . . . .'" (*Christensen* v. *Dewor Developments* (1983) 33 Cal.3d 778, 782 [191 Cal.Rptr. 8, 661 P.2d 1088].) The court should "'"'indulge every intendment to give effect to'"'" an arbitration agreement. (*Ibid.*) The Supreme Court has also determined: ". . . [W]hile there is no 'single test' for establishing waiver, 'the relevant factors include whether the party seeking arbitration . . . has acted in "bad faith" or with "wilful misconduct."' [Citations.]" (*Ibid.*)[9]

▮ A covenant of good faith and fair dealing is implied in every contract. (Rest.2d Contracts, § 205, p. 99.) The scope of that covenant varies

---

[7]The *Waller* court went on to conclude that the policyholders had no separate cause of action for breach of the implied covenant of good faith, because bad faith tactics by the insurer cannot create coverage when none exists under the terms of the policy. (*Waller, supra,* 11 Cal.4th at pp. 35-36.)

[8]"Waiver" is one of the three statutory grounds for denying enforcement of an arbitration provision mentioned in Code of Civil Procedure section 1281.2. Although "forfeiture" is not specifically enumerated, we understand the use of "waiver" in the statute to include "forfeiture" of that right as well.

[9]Again, we interpret the court's use of "waiver" here to mean "forfeiture," particularly because the loss of the right of arbitration in *Christensen* was occasioned by the plaintiffs' bad faith tactics rather than an intentional relinquishment of the right. (*Christensen* v. *Dewor Developments, supra,* 33 Cal.3d at p. 784.)

from case to case depending upon the contractual purposes. In the context of insurance contracts, the covenant requires the insurer to "give at least as much consideration to the welfare of its insured as it gives to its own interests." (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818 [169 Cal.Rptr. 691, 620 P.2d 141].) Part of this requirement is "the duty reasonably to inform an insured of the insured's rights and obligations under the insurance policy." (*Davis, supra,* 25 Cal.3d at p. 428.)

The insurer's duty to the insured as expressed in *Egan* v. *Mutual of Omaha Ins. Co, supra,* 24 Cal.3d at page 818, is thus greater than that of a party to an ordinary commercial contract. This heightened duty results from the unique nature of insurance contracts. When entering into an insurance contract, the insured does not bargain for profit. Instead, he bargains for the peace of mind that comes with knowing he will receive prompt payment of funds in time of need. Consequently, courts have imposed special obligations on insurers to promptly investigate and process claims so that an insured will not be denied the necessary funds to which he is entitled at the precise time he needs them most. (*Love* v. *Fire Ins. Exchange* (1990) 221 Cal.App.3d 1136, 1148 [271 Cal.Rptr. 246].)

In *Davis, supra,* the Supreme Court held that Blue Cross could not compel arbitration because it had failed "timely or meaningfully to apprise its insureds of their rights to arbitration . . . ." (25 Cal.3d at p. 421.) There, various insureds brought a class action alleging Blue Cross was systematically denying coverage to which they were entitled. Blue Cross petitioned to compel arbitration under Code of Civil Procedure section 1281.2. (*Davis, supra,* 25 Cal.3d at p. 421.) The trial court made several findings crucial to the Supreme Court's ruling. First, the court found that the arbitration provision was obscurely placed within the policy[10] and failed to advise policyholders of the procedure for initiating arbitration. As a result, Blue Cross reasonably should have known that its insureds would be unaware of their right to arbitration and the procedures for initiating it. Furthermore, once Blue Cross learned that its insureds did not agree with a claim resolution, it failed to inform them of the arbitration procedures. Finally, "[t]he court found that in this context Blue Cross' failure to inform its insureds of the policy's arbitration provision amounted to an 'implied misrepresentation . . . that such subscribers have no recourse but to accept the Blue Cross determination. . . .' Indeed, the court additionally determined that Blue

---

[10]"The trial court found, in this regard, that 'the clause in reference to arbitration is contained in a general section in the final page of a multi-page contract without being separately set out or referenced as an arbitration clause' and also that '[i]n none of the contracts . . . is there any bold type heading or other heading setting out "ARBITRATION CLAUSE" or words to that general effect.' " (*Davis, supra,* 25 Cal.3d at p. 422, fn. 3.)

Cross had adopted its course of conduct 'for the purpose of inducing subscribers to give up their rights under the Blue Cross insurance contracts.' " (*Id.* at p. 426.)[11]

The Supreme Court next addressed this issue in *Sarchett, supra,* 43 Cal.3d 1. There, the trial court found that Blue Shield had breached its duty of good faith and fair dealing by failing to adequately advise Sarchett of his contractual right to impartial review and arbitration in its letters denying his claim. (*Id.* at p. 5.) Sarchett's policy provided that all disputes would be resolved by peer review and arbitration. (*Id.* at p. 13.) Initially, Blue Shield denied Sarchett's claim by letter, which did not mention the availability of impartial review and arbitration.[12] Both Sarchett and his doctor sent letters to Blue Shield protesting the denial. Blue Shield then requested more information from Sarchett. After Sarchett informed Blue Shield that his doctor had provided all the necessary information and demanded a reevaluation of the claim, Blue Shield sent letters to Sarchett and the doctor, informing them the claim had been reevaluated and again denied. The hospital review committee then sent a letter to Blue Shield protesting the denial. In its written response to the review committee, Blue Shield mentioned for the first time the availability of impartial peer review of the claim "but only on condition that further 'solid' information is produced to support the need for hospitalization." (*Id.* at p. 5, fn. 4.)

A plurality of the Supreme Court concluded: "In the present case, Blue Shield failed to bring relevant information about the right to impartial review and arbitration to its insured's attention at the appropriate time. In *Davis* the policy's arbitration provision was obscurely placed in fine print, whereas here it was adequately set out with a bold-face heading. However, Blue Shield had reason to know that Sarchett was uninformed of his rights, since he repeatedly protested the denial without demanding review by an impartial panel of physicians. Blue Shield nevertheless denied Sarchett's claim several times without mentioning his right to review by anyone other than the single hired consultant who initially and repeatedly denied the claim. This course of conduct appears designed to mislead subscribers into forfeiting their

---

[11]As Justice Kennard pointed out in *Platt Pacific, Inc.* v. *Andelson, supra,* the term "waiver" has been used imprecisely to indicate the loss of a right, even though not knowingly and voluntarily relinquished. (6 Cal.4th at p. 315.) As evidence, we note the *Davis* court used the terms "waiver" and "forfeiture" interchangeably: ". . . [W]e conclude that the trial court properly determined that by its action Blue Cross waived or forfeited any right subsequently to compel its insureds to submit their disputes to arbitration." (25 Cal.3d at p. 431.)

[12]This letter read: " 'We are sorry that we cannot be of more help to the subscriber in this instance, but point out that we must adhere closely to the terms of the subscriber agreement in order to keep dues at a reasonable level.' " (*Sarchett, supra,* 43 Cal.3d at p. 13, italics omitted.)

contractual right to impartial review and arbitration of disputed claims, and therefore we must affirm the trial court's ruling on this issue." (*Sarchett, supra*, 43 Cal.3d at p. 15.)

Chief Justice Lucas dissented in *Sarchett*, noting that the arbitration provision was clearly set out, unlike the provision in *Davis*: "Sarchett testified, however, that he had a copy of his insurance policy booklet outlining his rights and that he had reviewed the booklet before deciding to select Blue Shield as his insurer. The information was at hand and Sarchett's failure to make use of it was not due to any fault of, or deception by, the insurer." (43 Cal.3d at p. 16 (conc. and dis. opn. of Lucas, C. J.).) The Chief Justice continued: "The role of an insurer should be to provide clear, accurate and adequate information to its insureds; once it has done so, it should not have to act as a paternalistic overseer." (*Id.* at p. 18.)

In response to the Chief Justice, the plurality wrote: "When a court is reviewing claims under an insurance policy, it must hold the insured bound by clear and conspicuous provisions in the policy even if evidence suggests that the insured did not read or understand them. Once it becomes clear to the insurer that its insured disputes its denial of coverage, however, the duty of good faith does not permit the insurer passively to assume that its insured is aware of his rights under the policy. The insurer must instead take affirmative steps to make sure that the insured is informed of his remedial rights." (*Sarchett, supra*, 43 Cal.3d at pp. 14-15, fn. omitted, citing *Davis*.) It is important to distinguish the two parts of the plurality's response.

First, the plurality articulated the principle that the insured is bound by a clear and conspicuous provision in the policy despite evidence the insured actually was ignorant of the provision. The principle that both parties are bound by the terms of the contract, even though one of them may misunderstand its terms, has substantial precedent. In *Hackethal* v. *National Casualty Co.* (1987) 189 Cal.App.3d 1102 [234 Cal.Rptr. 853], the insured, a doctor, sought coverage under a malpractice insurance policy for lost income sustained when he attended his own administrative disciplinary hearing. The claim was rejected because the lost-income provision covered only absence to attend "the trial of a civil suit for damages," and not administrative proceedings. (*Id.* at pp. 1107-1108, italics omitted.) Hackethal contended the agent who sold him the policy led him to believe the lost-income provision applied far more generally. (*Id.* at pp. 1106-1107.) The appellate court, in holding for the insurer, wrote: "If [Hackethal] did rely on the statements of the . . . agent in forming such belief, and for that reason renewed the policy, his reliance was *unjustifiable* as a matter of law. [¶] The brochure, which Dr. Hackethal carefully preserved with the original policy for nine years, put

him on notice that the terms of the policy controlled the extent of his coverage. The brochure clearly states: 'This brochure briefly outlines the insurance plan. Complete details and provisions of the insurance are contained *in the policy.*' (Italics added.) Moreover, the policy itself proclaims in bold letters: 'PLEASE READ YOUR POLICY.' Dr. Hackethal testified that he did in fact read his policy when he received it, but stated that he 'didn't analyze it . . . .' He should have done so. [¶] ' "It is a general rule that the receipt of a policy and its acceptance by the insured without an objection binds the insured as well as the insurer and *he cannot thereafter complain that he did not read it or know its terms.* It is a duty of the insured to read his policy." ' [Citations.]" (*Id.* at pp. 1111-1112, italics in original.)

In *Hadland* v. *NN Investors Life Ins. Co.* (1994) 24 Cal.App.4th 1578 [30 Cal.Rptr.2d 88], insureds disputed the partial coverage of medical bills. They contended when the agent sold them the policy in question he led them to believe coverage would be " 'as good if not better' " than their then existing policy. (*Id.* at p. 1581.) The court held that this belief was contrary to the express provisions of the written contract. (*Id.* at p. 1589.) Furthermore, "[t]he Hadlands, having failed to read the policy and having accepted it without objection, cannot be heard to complain it was not what they expected. Their reliance on representations about what they were getting for their money was unjustified as a matter of law." (*Ibid.,* fn. omitted.)

Thus, *Sarchett* confirmed the principle that both insured and insurer are bound by the clear language of the policy. However, in the second portion of its response to the Chief Justice, the *Sarchett* plurality stated: when an insured disputes a denial of coverage, an insurer cannot assume the insured is aware of his rights under the policy and must take affirmative steps to inform him of those rights. (43 Cal.3d at p. 15.) This latter statement is dictum and was apparently occasioned by the egregious conduct of Blue Shield in that case. While it is true that the insurer may not misrepresent facts (*Wyatt* v. *Union Mortgage Co.* (1979) 24 Cal.3d 773, 783 [157 Cal.Rptr. 392, 598 P.2d 45]) or fail to clarify an insured's obvious misunderstanding of the policy coverage (*Westrick* v. *State Farm Insurance* (1982) 137 Cal.App.3d 685, 692 [187 Cal.Rptr. 214]), the insurer does not have an ongoing duty to keep the insured informed of his rights once those rights have been clearly set forth in the policy. However, the insurer may not engage in conduct designed to mislead the insured.

For example, in *Love* v. *Fire Ins. Exchange, supra,* 221 Cal.App.3d 1136, the insureds submitted a timely claim for damages resulting from cracks in their home's foundation. Their expert concluded the damage was due to soil subsidence and the negligence of the builders. The insurer denied the claim

on the basis that the damage resulted from "an 'act of god.' " (*Id.* at p. 1141.) The insurer did not inform the insureds the loss would be covered if third party negligence was the proximate cause of the injury. After the statute of limitations had run, the insureds brought suit and alleged the insurer was estopped from asserting the statute of limitations as a bar, because it had a duty to disclose the alternative legal theory of recovery at the time of the original denial of the claim. (*Id.* at p. 1144.) The appellate court recognized the heightened duty of the insurer to the insured but concluded it did not rise to the level of a fiduciary duty. (*Id.* at pp. 1147-1149.) Consequently, the court held the insurer had no duty to inform the insured of the alternative theory of recovery: "We are unaware of any cases requiring an insurer to advise an insured of different legal theories or statutory provisions which an insured could use to avoid policy exclusions. The authorities suggest a contrary rule. 'An insurer is under no obligation to explain to the insured all possible legal theories of recovery.' [Citation.] Neither the insured's ignorance of nor the insurer's failure to explain the different legal theories upon which suit might be filed extends the time within which the insured is required to file his action." (*Id.* at p. 1150; see also *Neff* v. *New York Life Ins. Co.* (1947) 30 Cal.2d 165 [180 P.2d 900, 171 A.L.R. 563].)

Here, unlike *Davis*, the arbitration provision was clearly and conspicuously set forth in the policy. The table of contents, which is just over one page long, includes a separate reference to the binding arbitration provision as one of sixteen sections in the policy. In the body of the policy, that provision is set off by a fully capitalized heading in bold type. The provision is worded simply and explains in clear language the procedure for initiating arbitration. (See generally, *Malcom* v. *Farmers New World Life Ins. Co.* (1992) 4 Cal.App.4th 296, 302 [5 Cal.Rptr.2d 584] [discussing the clear and conspicuous placement of a suicide-exclusion provision in a life insurance policy].) Consequently, unlike *Davis*, the trial court made no finding that ". . . Blue Cross knew that in many instances its insureds would not be aware of the arbitration clause and that, despite this knowledge, Blue Cross deliberately decided not to inform its insureds of the arbitration procedure." (*Davis, supra,* 25 Cal.3d at p. 430.) The Supreme Court upheld the trial court's finding of a waiver in *Davis* because Blue Cross had "deliberately pursu[ed] a *course of conduct* which failed to apprise its insureds of the availability of arbitration . . . ." (*Id.* at p. 425, italics added.) The policy before us contains no evidence of a design to frustrate the insureds' right to arbitration. Instead, the policy clearly sets forth that right.

In *Sarchett*, the Supreme Court held Blue Shield's repeated denials of the claim without mentioning the right of arbitration constituted a "*course of conduct . . .* designed to mislead subscribers into forfeiting their contractual

right to impartial review and arbitration of disputed claims . . . ." (*Sarchett, supra,* 43 Cal.3d at p. 15, italics added.) The court was also influenced by the fact that Blue Shield's final concession to impartial review came only in a letter to the hospital review committee, rather than the insured, and was conditioned upon the production of more " 'solid' " information. (*Id.* at p. 13.)

In order to find a forfeiture by the insurer of the right to arbitration, we understand *Davis* and *Sarchett* to require conduct *designed* to mislead policyholders. Such a requirement balances the enhanced duty of the insurer as a contracting party against the strong public policy in favor of arbitration. Furthermore, the court's focus when evaluating an allegation of forfeiture should be on the subjective intent of the insurer. Such focus is consistent with a finding of bad faith and the imposition of a penalty in the form of forfeiture. Additionally, a finding of a subjective intent to mislead the policyholder thereby distinguishes forfeiture from estoppel. An insurer is estopped from asserting a right, even though it did not intend to mislead, as long as the insured reasonably relied to its detriment upon the insurer's action. (See *Waller, supra,* 11 Cal.4th at p. 34.) Forfeiture, on the other hand, requires an intent to mislead and is satisfied whether or not the insured is, in fact, misled.

Consequently, even if the insured is aware of the arbitration right, bad faith tactics designed to mislead the insured merit the sanction of forfeiture. Conversely, even if the insured in fact was unaware of the arbitration right, no forfeiture occurs if the insurer did not engage in behavior designed to mislead the insured. The insurer's ability to enforce the arbitration provision cannot realistically hinge on its ability to prove the insured had actual knowledge of the provision. (*Madden* v. *Kaiser Foundation Hospitals, supra,* 17 Cal.3d at p. 709, fn. 11; *Beynon* v. *Garden Grove Medical Group* (1980) 100 Cal.App.3d 698, 707-708 [161 Cal.Rptr. 146].) However, a determination of bad faith involves consideration of the totality of the circumstances, including whether the insurer has knowledge of facts suggesting the insured is unaware of the arbitration provision. In other words, in the case of forfeiture, the policyholder's actual ignorance of the provision is relevant to the extent that ignorance is known to the insurer.

Forfeiture of a contractual right is not favored in the law. (Civ. Code, § 1442.) Conversely, as set forth above, arbitration is favored in the law. Consequently, we hold that, as with waiver, the burden of proof is on the party asserting forfeiture and must be demonstrated by clear and convincing evidence.

Enforcement of an arbitration provision is a question for the court. (Code Civ. Proc., § 1281.2.) " 'Whether there has been a [forfeiture] of a right to

arbitrate is ordinarily a question of fact, and a finding of [forfeiture], if supported by sufficient evidence, is binding on an appellate court.'" (*Davis*, *supra*, 25 Cal.3d at p. 426.)[13] ■ The facts surrounding Chase's claim and Blue Cross's response were not in dispute. Further, the trial court made no finding that Blue Cross engaged in a course of conduct designed to mislead Chase. Instead, the trial court found the arbitration provision in the policy was clear and conspicuous but that there was communication between Blue Cross and Chase that did not mention the provision. At oral argument on the motion to compel arbitration, the court indicated its belief that *Davis* and *Sarchett* required the insurer to notify the insured of the arbitration provision in every communication. We disagree. As a matter of law, *Davis* and *Sarchett* do not require notification in every communication between the insurer and the insured. Instead, *Davis* and *Sarchett* call for the forfeiture of the right to arbitration if the insurer breaches the covenant of good faith and fair dealing by engaging in bad faith conduct designed to mislead the insured.

Although we reverse the lower court's finding based upon a misinterpretation of the governing legal principle, we cannot say that forfeiture does not lie here. The question of whether Blue Cross engaged in a course of conduct designed to mislead Chase is a factual one, which we decline to resolve in the first instance. The trial court may consider the fact that the arbitration provision in the policy was clear and conspicuous, that Blue Cross repeatedly informed Chase of the provision in correspondence regarding Micah's illness, that none of the correspondence regarding this particular claim included such notification, that one letter and a phone call informed Chase of the right to further internal review but made no mention of arbitration, that the policy itself made no mention of the internal review process, that Blue Cross delayed three months in responding to Chase's request for internal review and did so only after being contacted by the Department of Insurance, or any other factor bearing on whether Blue Cross sought to mislead Chase about the availability of arbitration.

## II.  *Federal Preemption of State Law*

■ Blue Cross further contends that arbitration should be compelled because state law (i.e., *Davis* and *Sarchett*) resulting in forfeiture of the right to arbitration is preempted by the FAA. (9 U.S.C. § 1 et seq.) We hold *Davis* and *Sarchett* are not preempted by the FAA. Consequently, our holding that an insurer forfeits the right to arbitrate if the covenant of good faith and fair dealing is breached does not violate federal law.

Section 2 of the FAA provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to

---

[13]Here, we substitute "forfeiture" for "waiver."

settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2.) As Justice Breyer recently noted: "States may regulate contracts, including arbitration clauses, under general contract law principles . . . ." (*Allied-Bruce Terminix Cos.* v. *Dobson* (1995) __ U.S. __, __ [130 L.Ed.2d 753, 769, 115 S.Ct. 834, 843] (*Terminix*).) Additionally, section 2 of the FAA does not require the revocation of the entire contract in order to avoid arbitration. Rather, the legal theory upon which the party seeks to avoid enforcement of the arbitration provision must be one that *would* suffice to revoke the contract.

■ According to the United States Supreme Court: "Section 2 [of the FAA] is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." (*Moses H. Cone Hospital* v. *Mercury Constr. Corp.* (1983) 460 U.S. 1, 24 [74 L.Ed.2d 765, 785, 103 S.Ct. 927].) "The legislative history of the Act establishes that the purpose behind its passage was to ensure judicial enforcement of privately made agreements to arbitrate. . . . The Act, after all, does not mandate the arbitration of all claims, but merely the enforcement—upon the motion of one of the parties—of privately negotiated arbitration agreements. The House Report accompanying the Act makes clear that its purpose was to place an arbitration agreement 'upon the same footing as other contracts, where it belongs,' H. R. Rep. No. 96, 68th Cong., 1st Sess., 1 (1924), and to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate." (*Dean Witter Reynolds Inc.* v. *Byrd* (1985) 470 U.S. 213, 219-220 [84 L.Ed.2d 158, 164, 105 S.Ct. 1238], fn. omitted.) The FAA covers any transaction that involves interstate commerce, whether or not the contracting parties contemplated the interstate commerce connection. (*Terminix, supra,* __ U.S. at p. __ [130 L.Ed.2d at p. 769, 115 S.Ct. at p. 843].) We accept the parties' apparent agreement that the insurance contract here involves interstate commerce and is, thus, generally subject to the FAA.

■ The next question is whether the rulings of *Davis* and *Sarchett* are preempted by the FAA. As we detailed above, the rulings of *Davis* and *Sarchett* are based on the covenant of good faith and fair dealing, which is implied in every contract in California. (Rest.2d Contracts, § 205, p. 99.) Breach of that covenant can result in the revocation of any contract. To that

extent, the denial of arbitration in *Davis* and *Sarchett* was based upon general contract principles, just as was contemplated by Justice Breyer in *Terminix*, *supra*, ___ U.S. at page ___ [130 L.Ed.2d at page 769, 115 S.Ct. at page 843]. Here, Chase does not seek revocation of the contract. Instead, she seeks to avoid enforcement of the arbitration provision. To that end, she alleges a breach of the covenant of good faith and fair dealing. Thus, Chase asks the court to deny arbitration based upon a general contract principle.

The broad purpose of the FAA to countermand judicial reluctance to enforce privately contracted arbitration agreements is not violated merely because general contract law principles preclude enforcement of an arbitration agreement. For instance, courts retain the power to invalidate arbitration agreements induced by fraud or overwhelming economic power. (See *Mitsubishi Motors* v. *Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 627 [87 L.Ed.2d 444, 455-456, 105 S.Ct. 3346].) Additionally, federal courts have held that arbitration is "waived" by a party who substantially invokes the judicial process to the detriment of the other party. (*Williams* v. *CIGNA Financial Advisors, Inc.* (5th Cir. 1995) 56 F.3d 656, 661; *Miller Brewing Co.* v. *Fort Worth Distributing Co.* (5th Cir. 1986) 781 F.2d 494, 496; *Rush* v. *Oppenheimer & Co.* (2d Cir. 1985) 779 F.2d 885, 887.)[14]

*Hull* v. *Norcom, Inc.* (11th Cir. 1985) 750 F.2d 1547 provides another example of the application of state law to defeat enforcement of an arbitration agreement without offending the FAA. In that case, an employment contract contained a bilateral arbitration agreement. However, the contract also gave the employer a unilateral right to institute judicial proceedings in the event of the employee's breach. (*Id.* at p. 1549.) After he was terminated, Hull filed suit, and Norcom moved to compel arbitration. (*Id.* at p. 1548.) The federal circuit court upheld invalidation of the arbitration clause under state contract law requiring mutuality of obligation: "We hold that the consideration exchanged for one party's promise to arbitrate must be the other party's promise to arbitrate at least some specified class of claims. Mere presence of an arbitration clause is insufficient to enforce the arbitration agreement." (*Id.* at p. 1550.) Additionally, the court rejected the assertion that state law of mutuality was preempted by the FAA. (*Id.* at p. 1551.)

Because arbitration agreements are not beyond the reach of ordinary contract principles, there is no reason why this contract of insurance and its arbitration provision should be exempt from the covenant of good faith and fair dealing that is implied in every contract. We distinguish a variety of cases in which state laws *directed* at arbitration clauses ran afoul of the FAA.

---

[14]In that context, courts have used the term "waiver" under circumstances more akin to estoppel.

In *Terminix*, *supra*, the Supreme Court determined that the FAA preempted an Alabama state law that made written, predispute arbitration agreements unenforceable. (__ U.S. at p. __ [130 L.Ed.2d at p. 761, 115 S.Ct. at p. 837].) In *Perry* v. *Thomas* (1987) 482 U.S. 483, 492 [96 L.Ed.2d 426, 437, 107 S.Ct. 2520], the court held the FAA preempted California Labor Code section 229, which provides that an aggrieved employee may bring a judicial action for the recovery of wages "without regard to the existence of any private agreement to arbitrate." In *Southland Corp.* v. *Keating* (1984) 465 U.S. 1, 10, 16 [79 L.Ed.2d 1, 11-12, 15-16, 104 S.Ct. 852], the court held the FAA preempted California Corporations Code section 31512, which provides judicial remedy to franchisees who have otherwise contracted to submit to arbitration. In each case, the court invalidated a state law specifically designed to preclude operation of a privately contracted arbitration agreement.

The federal circuit courts have gone further and found that state provisions placing greater requirements upon arbitration clauses than on other contract clauses are preempted. In *David L. Threlkeld & Co.* v. *Metallgesellschaft Ltd.* (2d Cir. 1991) 923 F.2d 245, 249, the court held a Vermont statute that required arbitration agreements to be prominently displayed and signed by the parties was preempted by the FAA. In *Securities Industry Ass'n* v. *Connolly* (1st Cir. 1989) 883 F.2d 1114, 1117, 1123, the court held a series of Massachusetts regulations, imposing requirements for arbitration clauses that were not placed on other contract provisions, were preempted by the FAA.[15]

We understand the FAA to prevent states from impeding private parties who have agreed to arbitration or wish to do so, except to the extent the state would intervene ordinarily on general contract grounds. Here, we are not concerned with a state law designed to frustrate entry into an arbitration agreement or to invalidate arbitration agreements per se.[16] The parties are free to agree to arbitration as they wish. Our ruling applies only when an insured can demonstrate bad faith by the insurer designed to mislead the

---

[15]In *Casarotto* v. *Lombardi* (1994) 268 Mont. 369 [886 P.2d 931, 933, 939], the Montana Supreme Court held that state law requiring notice of an arbitration agreement on the first page of the contract was not preempted by the FAA. The United States Supreme Court granted certiorari in that case, vacated judgment, and remanded for reconsideration in light of its ruling in *Terminix*. (*Doctor's Associates, Inc.* v. *Casarotto* (1995) __ U.S. __ [132 L.Ed.2d 807, 115 S.Ct. 2552].) On reconsideration, the Montana Supreme Court reached the same conclusion. (*Casarotto* v. *Lombardi* (Mont. 1995) 901 P.2d 596, 599.) The United States Supreme Court has again granted certiorari. (*Doctor's Associates, Inc.* v. *Casarotto* (1996) __ U.S. __ [133 L.Ed.2d 594, 116 S.Ct. 690].)

[16]We recognize, for purposes of a federal preemption analysis, there is no distinction between a state legislative enactment, administrative regulation, or judicially declared rule. (*Securities Industry Ass'n* v. *Connolly, supra*, 883 F.2d at p. 1120, fn. 4.)

insured into not exercising the right of arbitration for which they contracted. Additionally, if the trial court declares a forfeiture, it does not invalidate the arbitration clause in toto. Rather, the trial court finds that, as to a specific claim against the policy, the conduct of the insurer merits forfeiture of the right of arbitration because the covenant of good faith and fair dealing has been breached.

In fact, though our ruling is not preempted by the FAA, the interpretation imposed by the trial court would be. The trial court's requirement that Blue Cross place notice of the arbitration agreement in every correspondence with Chase is exactly the type of anti-arbitration law preempted by the FAA. That requirement is very similar to the regulations invalidated by the federal circuit courts in *David L. Threlkeld & Co.* v. *Metallgesellschaft Ltd.*, *supra*, 923 F.2d 245 and *Securities Industry Ass'n* v. *Connolly*, *supra*, 883 F.2d 1114. Instead, our holding requires forfeiture of the right of arbitration only when the covenant of good faith and fair dealing is breached. The application of that general contract law principle is not preempted by the FAA even though the denial of arbitration may result.

## Disposition

The order of the superior court denying the petition to compel arbitration is reversed. The matter is remanded for further proceedings on that petition. Each party is to bear its own costs on appeal.

Chin, P. J., and Parrilli, J., concurred.