Filed 10/19/20  Natsu Corp. v. Penn-Star Ins. Co. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| NATSU CORPORATION,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>PENN-STAR INSURANCE<br>COMPANY, et al.,<br><br>　　　Defendant and Appellant. | A158407<br><br>(Contra Costa County<br>Super. Ct. No.<br>CIV MSC17-01084) |

Penn-Star Insurance Company and Global Indemnity Group (collectively Insurers) petitioned to compel appraisal of fire losses claimed by policyholder Natsu Corporation.  The trial court denied the petition, on the basis that Insurers waived their right to an appraisal.  On appeal, Insurers contend the appraisal was a mandatory condition precedent to resolution of Natsu's claim and they did not waive it.  We conclude the trial court applied a proper standard when it determined Insurers waived an appraisal and substantial evidence supported its finding.  We affirm.

## BACKGROUND

Natsu operated a manufacturing facility in Richmond.  Using thinly sliced wood or veneer as raw material, Natsu created custom-manufactured doors, cabinets, wall coverings, and related products.

1

On September 30, 2016, a hot press machine at the facility used to fuse veneer panels overheated and sparked a fire that destroyed the press and the veneer being processed. Smoke, soot, and odor damage from the fire occurred throughout Natsu's facility and spoiled its raw material inventory.

At the time of the fire, Natsu was insured under a policy issued by Insurers (the Policy). The Policy covered losses of building and personal property (Property) and business income (Income). The Property coverage was subject to a $1.1 million limit with a 90% co-insurance provision, and the Income coverage was subject to a $900,000 limit with an 80% co-insurance provision.

The Policy's Property Coverage Form included the following provision: "If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding. Each party will: [¶] a. Pay its chosen appraiser; and [¶] b. Bear the other expenses of the appraisal and umpire equally. [¶] If there is an appraisal, we will still retain our right to deny the claim."

The Policy's Income Coverage Form carried a similar provision: "If we and you disagree on the value of the property or the amount of Net Income and operating expense or the amount of loss, either may make written demand for an appraisal of the loss." The process for umpire selection and decision-making was the same as described for the Property loss appraisal.

2

On the day of the fire, Natsu submitted a claim under the Policy for its losses. Insurers acknowledged the claim under a reservation of rights pending investigation. Insurers retained various third parties to assist in its investigation, including an independent adjuster and a salvage company. The salvage company inventoried Natsu's equipment and wood veneer stock. A forensic accountant assisted Insurers in evaluating the claimed loss of business income.

On November 3, 2016, Natsu submitted a claim to Insurers for approximately $1.1 million. The claim was based on the actual cash value of its lost and smoke-damaged wood stock of about $1.3 million less a percentage for co-insurance recovery.

On November 11, 2016, Insurers informed Natsu that its investigation was continuing under a reservation of rights until the claim could be verified and calculated. It specifically was "[w]aiving none and reserving to [Insurers] all of its rights and defenses under and pursuant to [the Policy]."

Insurers continued their investigation for the next several months and requested backup documentation and business records from Natsu to substantiate the origination and values of the lost inventory. Insurers also paid thousands of dollars in advances to Natsu under the Policy during the course of the investigation.

Eventually, a disagreement arose regarding the reimbursement due to Natsu under the Policy. Around April 12, 2017, Natsu emailed Insurers and requested they pay $1 million to settle the claim before Natsu obtained counsel. In response, Insurers disputed the value of Natsu's wood veneer inventory and lost business income. Insurers informed Natsu it would apply a 50% depreciation fee to its $1.3 million lost inventory claim based on questions about the age and origin of its inventory. Regarding Natsu's

3

claimed Income loss, Insurers acknowledged receiving additional support for the claim and issued a check that brought the Income payment to approximately $200,000. Insurers expressed their firm belief that this was the amount due under the Income portion of the policy. They concluded by extending an offer of an additional $120,683 to fully resolve the claim.

Natsu rejected the settlement offer. It asserted the depreciation was arbitrary and inapplicable under the circumstances. Acknowledging the receipt of $104,302 from Insurers, Natsu stated its revised settlement demand to close the claim was now $895,698. No settlement was reached.

On June 6, 2017, Natsu sued Insurers alleging contract and tort damages and seeking additional payments under the Policy. Natsu's complaint alleged Insurers still owed more than $600,000 for its Property loss and more than $180,000 for its Income loss. In their Answer, Insurers asserted Natsu was entitled to no damages, their own loss calculations were correct and the claim already paid, and requested Natsu's complaint be dismissed with prejudice. Discovery followed.

On December 1, 2017, Natsu's counsel made an appraisal demand on Insurers' counsel: "Pursuant to Section E. Paragraph 2 of the Business Personal Property Coverage Form in [the Policy], Natsu Corporation does hereby demand appraisal of Natsu's business personal property loss arising from the September 30, 2016 fire loss at Natsu's facility. [¶] Please contact [my co-counsel] or me at your earliest convenience to discuss the choice of appraisers and scheduling the appraisal process."

On December 28, 2017, Insurers' counsel responded: "[Insurers] agree to appraisal of the loss under the policy's appraisal provision, as requested in [Natsu's counsel's] letter. I'll try to call you tomorrow (Friday) to discuss selection of appraisers and how to do this as efficiently as we might." On

January 4, 2018, Natsu's counsel followed up with an email to Insurers' counsel: "This follows your email . . . agreeing to the use of appraisal. It also follows your T/C with [my co-counsel] and the VM message I just left at your office. You have agreed to go forward with 'APPRAISAL' per your policy as to business personal property. We will send you a stipulation regarding same." Later that day, Natsu's counsel emailed Insurers' counsel again: "This confirms our conversation: . . . [¶] . . . We are undertaking appraisal for Property only and [my co-counsel] will send a stipulation for execution we can supply to the court. . . ." On January 8, 2018, Insurers' counsel replied, "[A]greed."

In a declaration, Natsu's counsel stated: "While [Insurers' counsel] expressed some interest in proceeding with the appraisal process as reflected in correspondence . . . he never followed through. Instead, [he] advised me that [Insurers] preferred to mediate the dispute in lieu of submitting the dispute to the appraisal process at that time. This fact was communicated to me during an April 5, 2018 site inspection at [Natsu's] facility."

On April 26, 2018, the parties participated in a one-day mediation which was unsuccessful.

The parties disagree on whether appraisal was discussed in the 14 months following mediation. According to Natsu's counsel, "neither [Insurers' counsel] or anyone else associated with insurer ever raised the issue of appraisal during the balance of 2018 or the first 5 months of 2019." Insurers say their May 21, 2018 case management statement flagged a "[p]ossible motion to compel appraisal under insurance policy" as a motion they expected to file before trial. They also note they raised the possibility of an appraisal at a later case management conference.

During this time, the parties continued to engage in discovery. In June 2018, the parties agreed to a referee in order to resolve their various discovery disputes. Between October 2018 and August 2019, the referee issued four substantive rulings, all of which were adopted by the trial court after Insurers objected to most of them.

During this period, the parties were before the court for multiple case management conferences.

In October 2018, Insurers reconsidered their position related to Natsu's Property claim. They informed Natsu they would not apply 50% depreciation to the claimed losses and would pay based on Natsu's approximate $1.3 million inventory valuation. Insurers tendered an additional $475,000 to Natsu which included interest and brought its Property payments to approximately $919,000. Along with the approximately $200,000 Insurers had already paid towards the income loss claim, Insurers' total payments to Natsu at the time exceeded $1.1 million.

Nevertheless, the dispute persisted, and according to Insurers' January 2019 case management conference statement, issues remained with respect to the co-insurance calculation, lost business income, and Natsu's claim for damages for Insurers' unreasonable delay.

In March 2019, Insurers associated in new counsel. In April 2019, the parties participated in another mediation which was also unsuccessful.

In May 2019, the court held another status conference. In their case management statement, Insurers indicated they would file "possibly discovery motions" before trial, but no longer expressly mentioned a potential motion to compel appraisal. The court set a 10-day trial to begin on November 4, 2019. After the trial date was set, Insurers' counsel stated to the court: "We'll chat about this. In fact, the whole jury trial thing we'll

probably discuss between then and now, and maybe there'll be some, I don't know, statutory things, like appraisal, that will happen in the meantime, that could solve some issues."

In early June 2019, Natsu filed a Statement of Damages contending that it has sustained approximately $2.7 million in covered losses under the policy. This included approximately $1.5 million in Income losses.

On June 26, 2019, Insurers requested an appraisal. Their letter to Natsu stated, "You are hereby notified that [Insurers] . . . disagree[] with you as to the amount of loss claimed under [the Policy] and an appraisal of the business personal property and business income claim is hereby demanded pursuant to the terms of the policy and Insurance Code section 2071. [¶] . . . . [¶] This letter is a demand for an appraisal, and is not to be construed as a denial or admission of liability in any amount whatsoever, nor as a waiver of any of the terms or conditions of the policy, or of any rights or defenses now or hereafter available to the undersigned insurer." Natsu did not comply with the appraisal demand.

On July 3, 2019, Insurers petitioned to compel appraisal and moved to stay the action pending completion of the appraisal.

In August 2019, the court denied Insurers' petition for appraisal. The court's written order stated, "Appraisal is not an unconditional requirement of the policy. It is optional at the election of the parties." The court noted that appraisal under Insurance Code section 2071 is deemed an arbitration as a matter of law and subject to statutory contractual arbitration law, including concepts of waiver. The court explained that a waiver of arbitration "does not require a voluntary relinquishment of a known right" but rather could occur "by an untimely demand, even without intending to give up the remedy." It concluded with these findings: "The court finds that

7

by failing to demand an appraisal when they first answered or to mention it as an affirmative defense, by participating in the January and May 2019 Case Management Conferences without mentioning any demand for an appraisal, by participating in discovery, by requesting relief from the court regarding Discovery Orders recommended by the discovery referee, by not demanding an appraisal immediately if the idea for it was recommended by new defense counsel brought into the case in March 2019, and by not demanding or moving for an appraisal until, and in apparent direct response, to an earlier trial date than they wanted, [Insurers] have taken steps inconsistent with an intention to do an appraisal, delayed unreasonably in demanding one, and prejudiced [Natsu] by depriving her of the benefits of the efficiencies and cost benefits that an appraisal was supposed to provide." The court also denied Insurers' motion for stay.

Insurers immediately appealed the court's order pursuant to Code of Civil Procedure section 1294, subdivision (a). The appeal triggered an automatic stay of the litigation with the exception of matters pending before the discovery referee. Thus, the court vacated the November 2019 trial date, all pre-trial filing and cut off dates, and all hearing dates on pre-trial motions pending resolution of this appeal.[1]

## DISCUSSION

### A.  Applicable Law

Insurance Code section 2071 sets forth the requirements of the standard-form fire insurance policy. (See *Aliberti v. Allstate Ins. Co.* (1999) 74 Cal.App.4th 138, 142, fn. 5.) One requirement is a provision which gives both the insurer and insured the right to an appraisal if they cannot agree

---

[1] Before Insurers filed their opening brief, Natsu moved to dismiss the appeal on the grounds that it was frivolous, filed in bad faith, and initiated solely to delay trial. This court denied the motion.

8

"as to the actual cash value or the amount of loss." (Ins. Code, § 2071, subd, (a); *Gebers v. State Farm General Ins. Co.* (1995) 38 Cal.App.4th 1648, 1651 ["Since its substance was first enacted in 1909, Insurance Code section 2071 has directed that the standard form for fire insurance policies include an appraisal provision to settle disagreements concerning the amount of loss."].)

A policy provision for an appraisal included in a standard fire insurance policy constitutes an "agreement" within the meaning of Code of Civil Procedure section 1280, subdivision (a), which states in part: " 'Agreement' [as used in this title] includes but is not limited to agreements providing for valuations, appraisals and similar proceedings." (Code Civ. Proc. § 1280, subd. (a).) Thus an appraisal agreement is "considered to be an arbitration agreement subject to the statutory contractual arbitration law," and "[a]n appraisal pursuant to [Insurance Code] section 2071 is deemed an arbitration as a matter of law." (*Kirkwood v. California State Automobile Assn. Inter-Ins. Bureau* (2011) 193 Cal.App.4th 49, 57 (*Kirkwood*).) Code of Civil Procedure section 1281.2 subdivision (a) provides that a trial court shall refuse to compel arbitration if it determines that "[t]he right to compel arbitration has been waived by the petitioner." (Code Civ. Proc., § 1281.2, subd. (a).)

In an appeal from an order granting or denying a petition to compel an appraisal, we apply a de novo standard of review when the issue turns on the interpretation of the insurance policy and the governing statutory scheme. (*Lee v. California Capital Ins. Co.* (2015) 237 Cal.App.4th 1154, 1164) But when the issue is whether there has been a waiver of the right to compel arbitration, that is " 'ordinarily a question of fact, and a finding of waiver, if supported by sufficient evidence, is binding on an appellate court.' " (*Engalla*

9

*v. Permanent Medical Group, Inc.* (1997) 15 Cal.4th 951, 983 (*Engalla*); *Davis v. Bluecross of Northern California* (1979) 25 Cal.3d 418, 425-426 (*Davis*).)

## B.     Right to Appraisal is Waivable

Insurers initial argument is that the trial court erred in ruling the appraisal provision in the policy was not a mandatory condition precedent to any judicial resolution of the parties' dispute.  According to Insurers, "[f]or over 100 years, the California Legislature and courts have construed appraisal conditions identical to [Insurers] policy as a mandatory condition precedent to any adjudicated resolution of disputed claim regarding the 'value' or 'amount of loss' claimed due under standard insurance fire insurance policies."  According to Insurers, "Failing an agreement on the total amount of the covered loss, the mandatory appraisal process is a condition that must <u>precede</u> the trial or other adjudication of ***those claims***."

We readily dismiss this argument.  While the appraisal provision is a mandatory part of the standard fire insurance policy (see Ins. Code, § 2071) and included in the Policy here, it is well established that the right to appraisal can be waived.  (See Code Civ. Proc., § 1281.2 [trial court may refuse to compel arbitration on waiver grounds].)  Although they disagree with the standard applied by the trial court to determine whether they waived their right, even Insurers acknowledge the right to appraisal may be waived.  Accordingly, because it can be waived, appraisal was not a mandatory condition precedent to judicial resolution of the parties' dispute.

## C.     Standard for Waiver of Appraisal Right

Insurers next contend the trial court applied the wrong legal standard to assess whether they waived appraisal.  Relying upon statutes pertaining to contractual arbitration, the trial court noted that "a party waives the right to arbitration by taking steps inconsistent with an intent to invoke arbitration,

10

unreasonably delays in undertaking the procedure, or engages in bad faith or willful misconduct." Insurers argue the trial court erred when it applied this forfeiture standard. They say it only applies in contractual arbitration cases, and the court was wrong to conclude that " 'waiver does not require the voluntary relinquishment of a known right.' " We agree with the trial court.

"Waiver" has multiple meanings and courts "have used the term 'waiver' to refer to a number of different concepts. " (*Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 315 (*Platt Pacific*).) "[S]ome decisions have defined the term 'waiver' as the voluntary relinquishment of a known right." (*Id.* at p. 314.) "But it can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to abandon or relinquish the right." (*Id.* at p. 315.)

"In the past, California courts have found a waiver of the right to demand arbitration in a variety of contexts, ranging from situations in which the party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke arbitration [citations] to instances in which the petitioning party has unreasonably delayed in undertaking the procedure. [Citations.] The decisions likewise hold that the 'bad faith' or 'wilful misconduct' of a party may constitute a waiver and thus justify a refusal to compel arbitration." (*Davis, supra*, 25 Cal.3d at pp. 425-426 ) Although "forfeiture" is not specifically enumerated in Code of Civil Procedure section 1281.2, the use of "waiver" in the statute includes "forfeiture" of that right as well. (*Chase v. Blue Cross of California* (1996) 42 Cal.App.4th 1142, 1151, fn. 8 (*Chase*).)

As a result of the varied meanings of the term "waiver" and the variety of contexts in which waiver of the right to compel arbitration has been found,

the Supreme Court has recognized 'that no single test delineates the nature of the conduct of a party that will constitute . . . a waiver.' " (*Engalla, supra,* 15 Cal.4th at p. 983; *Chase, supra,* 42 Cal.App.4th at p. 1151 ["there is no 'single test' for establishing waiver" ]; *Davis, supra,* 25 Cal.3d at p. 426 ["[O]ur cases establish that no single test delineates the nature of the conduct of a party that will constitute such a waiver."].)

Absent a single test to determine what conduct constitutes a waiver, our Supreme Court has identified the following relevant factors for consideration:  " ' "(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether 'the litigation machinery has been substantially invoked' and the parties 'were well into preparation of a lawsuit' before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) 'whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place'; and (6) whether the delay 'affected, misled, or prejudiced' the opposing party." ' " (*St. Agnes Medical Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1195-1196 (*St. Agnes Medical Center*).)  But "[w]aiver is not a mechanical process and no one factor is predominant." (*Fleming Distribution Co. v. Younan* (2020) 49 Cal.App.5th 73, 80.)

These factors which the Supreme Court says are "relevant and properly considered in assessing waiver claims" represent a range of considerations untethered to a party's intent.  In light of the myriad factors California courts may consider to determine whether there was a waiver of the right to arbitration and the variety of contexts in which those courts have found

12

waiver, the trial court here did not err when it applied a forfeiture standard to evaluate whether Insurers waived their right to appraisal. (See *Chase*, *supra*, 42 Cal.App.4th at p. 1151, fn. 8 [use of "waiver" in Code of Civil Procedure section 1281.2 includes "forfeiture" of the right as well]; cf. *Engalla*, *supra*, 15 Cal.4th at pp. 983-984 [waiver may be found from evidence of a party's unreasonable and substantial delay where claimant has acted with reasonable diligence].)

Insurers contend "[t]he analogy to contractual arbitration in the statutory appraisal context is inapt." In their view, "[b]ecause mandatory appraisal of losses payable under fire insurance policies involves a 'substantive' right . . . that right cannot be waived by mere implication." They insist that "[w]aiver of the condition to appraise losses under a standard fire policy requires the 'intentional relinquishment' of a known right." We disagree.

It is well established that appraisals are a form of arbitration subject to the rules governing arbitration. (See *Doan v. State Farm General Ins. Co.* (2011) 195 Cal.App.4th 1082, 1094 [" '[A]n appraisal is a special form of limited arbitration.' "]; *Kacha v. Allstate Ins. Co.* (2006) 140 Cal.App.4th 1023, 1031 ["Appraisal hearings are a form of arbitration and are generally subject to the rules governing arbitration."].) While there are differences between an arbitration and an appraisal (see, e.g., *Kirkwood, supra,* 193 Cal.App.4th at pp. 58-59), Insurers provide no authority for their assertion that these differences compel application of different rules to assess waiver. They cite *Community Assisting Recovery, Inc. v. Aegis Security Ins. Co.* (2001) 92 Cal.App.4th 886, but that court acknowledged that a policy's "appraisal term creates an arbitration agreement subject to the statutory contractual arbitration law" and the opinion includes no discussion of waiver. (*Id.* at p.

13

893.)  They also cite *Appalachian Insurance Company v. Rivcom Corporation* (1982) 130 Cal.App.3d 818, but that case similarly acknowledges that "an agreement providing for an appraisal is included within the concept of agreements to arbitrate" and supports the view that a party's conduct can indeed support a finding of waiver.  (*Id.* at pp. 824-826.)

Nor do Insurers provide support for their argument that waiver of appraisal requires the "intentional relinquishment" of the right.  The Supreme Court has recognized that waiver can turn on the "voluntary relinquishment of a known right."  (*Platt Pacific*, *supra*, 6 Cal.4th at p. 315.)  Some cases, including a case cited by Insurers, apply this standard.  (See, e.g., *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31.)  But the Supreme Court has also recognized that waiver "can also mean the loss of an opportunity or a right as a result of a party's failure to perform an act it is required to perform, *regardless of the party's intent to abandon or relinquish the right*."  (*Platt Pacific*, *supra*, 6 Cal.4th at p. 315, italics added.)  Intentional relinquishment of a right is not required.

Insurers proffer what they call a "proper test" for waiver of appraisal focused on "whether the party intentionally relinquished or explicitly abandoned that right."  This is not a test we can endorse.  Not only is it premised on non-controlling out-of-state authorities, it contravenes our own Supreme Court which has made clear there is no single test for establishing waiver.

## D.    Substantial Evidence

Under the factors *St. Agnes Medical Center*, *supra*, 31 Cal.4th 1187, directs us to consider, substantial evidence supported the finding of waiver.

There was ample evidence that Insurers took steps inconsistent with any intent to invoke the appraisal process and unreasonably delayed

14

invoking it. (See also *Spracher v. Paul M. Zagaris, Inc.* (2019) 39 Cal.App.5th 1135, 1138 ["Unreasonable delay in seeking arbitration may, standing alone, constitute a waiver of a right to arbitrate."].) The fire occurred on September 30, 2016, and Natsu notified Insurers of the loss the same day. Natsu submitted its claim to Insurers on November 3, 2016. By no later than April 2017, after months of Insurers' investigation, it was apparent to the parties that they disagreed as to the value of Natsu's losses. Insurers did not demand an appraisal. Rather, after Natsu filed suit a few months later in June 2017, Insurers litigated. Over the course of two years, they engaged in discovery, status conferences, and mediation but never pressed their demand for appraisal. Moreover, Natsu demanded appraisal in December 2017, and while Insurers appeared receptive, the record indicates they opted to mediate the dispute rather than submit it to an appraiser.[2] Nor did they ever demand appraisal following their unsuccessful mediation. In October 2018, Insurers relented on the core dispute between the parties. They accepted Natsu's $1.3 million valuation of its lost inventory and paid out the Property loss based on that valuation.

In light of this record, we see how the June 2019 demand for appraisal and the follow-on stay request were unexpected and contrary to the apparent resolution of the Property loss claim. Insurers' appraisal demand arrived nearly two years and nine months after they were notified of the claimed losses, two years after Insurers' filed suit for additional payments and the

---

[2] Insurers contested this finding with a declaration from a Global Indemnity Group assistant vice president who attested that Insurers never agreed that mediation was in lieu of appraisal. But "[w]hen reviewing for substantial evidence, 'all conflicts must be resolved in favor of the prevailing party, and all legitimate and reasonable inferences must be indulged in order to uphold the trial court's finding.'" (*In re Marriage of Berman* (2017) 15 Cal.App.5th 914, 920.)

parties had actively litigated and mediated the claim, and four months before the scheduled trial date. The June 2019 demand was also the first time appraisal of Natsu's claimed Income losses in addition to Property losses was ever mentioned. The demand was exceedingly tardy. On this record, we would conclude " 'the litigation machinery [was] substantially invoked' and the parties 'were well into preparation of a lawsuit before the party notified the opposing party of an intent to arbitrate.' " (*St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1195.) Viewing the evidence in the light most favorable to Natsu (see *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660), these facts supported the trial court's finding of waiver.

Contrary to the Insurers' argument, there was also substantial evidence showing Natsu would be prejudiced by submitting to Insurers' appraisal demand at this juncture. (See *St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1196.) Prejudice can be found "where the petitioning party has unreasonably delayed seeking arbitration or substantially impaired an opponent's ability to use the benefits and efficiencies of arbitration." (*Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1205). The record shows Natsu engaged in nearly two years of active litigation prior to Insurers' appraisal demand. During that time, Natsu retained counsel, filed suit, propounded substantial discovery, defended multiple contested discovery requests before a referee, attended status conferences, and twice mediated its claim. As the trial court found, compelling appraisal at this stage after the valuation dispute had been vigorously litigated for two years would deprive Natsu of the benefits and efficiencies the "informal process" of appraisal was designed to achieve. (Ins. Code, § 2071.)

There was also other evidence demonstrating prejudice to Natsu from the delayed demand. The losses Natsu claimed arose largely from raw

material damaged in a September 2016 fire.  In the ensuing months and years Natsu endeavored to settle the claim.  Finally, in October 2018, nearly two years after the fire and one year and two months after Natsu sued Insurers for its losses, Insurers decided to pay out Natsu's Property claim based on the approximately $1.3 million valuation Natsu tendered in November 2016.  At that time, Insurers noted that the original inventory used in Natsu's claim was "the result of a joint project between [Insurers] and Natsu" and that the "the effort needed to undertak[e] a second inventory would be extensive, especially where the inventory has been moved since the first project and stacked in the back of the warehouse."  Insurers then informed Natsu they would "not impose the burden of hosting or participating in a second, more detailed inventory".  Revisiting Natsu's lost inventory, a step we can infer would be part of an appraisal, would involve a process even Insurers describe as extensive and burdensome.  Doing so nearly three years after the fire and 9 months after they had "accept[ed] Natsu's compilation of $1,301,626 as the cost to replace all the lost veneers with new veneers of the same type" further underscores the prejudice to Natsu that would result from appraisal.

Insurers argue there was no evidence they intentionally relinquished an appraisal and emphasize how the record shows they never rejected such a request.  Because intent is not a necessary element of waiver, we need not address these arguments.

## DISPOSITION

The order denying Insurers' petition to compel appraisal is affirmed. Natsu is awarded its costs on appeal.

17

_____

SIGGINS, PJ.

We concur.

_____

FUJISAKI, J.

_____

PETROU, J.

(A158407)

18