[Civ. No. 21876.   First Dist., Div. Two.   Aug. 16, 1965.]

HIROKO McCARY, Plaintiff and Appellant, v. JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY, Defendant and Respondent.

Garry, Dreyfus & McTernan, Charles R. Garry and Donald L. A. Kerson for Plaintiff and Appellant.

Harold C. Nachtrieb, Allan, Miller, Groezinger, Keesling & Martin for Defendant and Respondent.

AGEE, J.—On August 27, 1958, defendant-respondent, referred to herein as the "Company," issued its insurance policy on the life of Robert L. McCary, hereafter referred to as the "Insured." Attached to the policy and made a separate part thereof is a "Supplementary Provision For Family Income." The beneficiary under each is the Insured's wife, who is the plaintiff-appellant herein. A combined

monthly premium of $19.50 became due on the 27th day of each month.

The Insured died of cancer on January 13, 1961. The Company contends that the policy and attached supplementary provision had lapsed for nonpayment of the premium due on July 27, 1960.[1]

However, nonforfeiture provisions contained in the basic policy continued it in force as term insurance for a period which had not expired by the date of the Insured's death. As further provided therein such ''Extended term insurance shall be automatically binding upon the Company. . . .''

On this basis the Company admits its liability for the ''sum insured'' under the policy, which is $5,000. Thus the litigation, as a practical matter, is confined to the question of the Company's liability under the supplementary provision, which expressly provides that ''the provisions in the policy entitled . . . 'Nonforfeiture Provisions' . . . shall not be applicable to this supplementary provision nor shall they be affected hereby.''

The supplementary provision provided term insurance for the 20-year period commencing with the issue date of the policy. If the Insured died within such period the beneficiary was to be paid a monthly amount during the remainder of the period. If the supplementary provision had been in effect at the time of the Insured's death, appellant would have become entitled to a lump sum payment of $17,903.50.

The trial herein was by jury and the *sole* issue presented to it to decide was whether, *assuming* that the supplementary provision had lapsed for nonpayment of premium, the Insured had made a material misrepresentation of fact in his application for the reinstatement thereof which vitiated the Company's approval of such application. The jury decided this issue adversely to appellant and therefore limited the amount of her recovery to the $5,000 admittedly due under the basic policy.

Appellant does not on appeal attempt to attack the correctness of the jury's implied finding as to material misrepre-

---

[1] The policy provides that, ''Except as herein expressly provided, the payment of any premium shall not maintain this policy in force beyond the date when the next succeeding premium becomes payable.'' The supplementary provision provides that it shall terminate upon ''the expiration of the grace period allowed for the payment of any premium in default under this policy or this supplementary provision . . . .'' The policy provides for a grace period of 31 days.

sentation, apparently recognizing that such finding is supported by substantial evidence.[2]

Appellant's chief contention on appeal is that the Company had waived, or was estopped to assert, a forfeiture based upon the failure of the Insured to pay the July 27, 1960 premium until October 1, 1960. Both issues were timely raised and are included in the pretrial order. Appellant points to the Company's previous conduct in accepting late premium payments without declaring a forfeiture and asserts that this conduct had ''led the insured to the reasonable belief that strict compliance with the provisions of the policy was not required to avoid a forfeiture.''

Appellant's proposed instructions on waiver and estoppel were refused by the trial court on the ground that the evidence was insufficient as a matter of law to support a finding in favor of appellant on either issue.

Respondent Company states that it ''does not quarrel with the law as stated in the requested instruction[s]'' (on waiver and estoppel) and that ''it becomes only necessary to examine the evidence. . . .''

■ It is well settled that ''a party has a *right* to instructions on his theory of the case, if it is reasonable and finds support in the pleadings and evidence or any inference which may be properly drawn from the evidence.'' (2 Witkin, Cal. Procedure, p. 1780.)

■ It is not necessary that such evidentiary support be clear and convincing. ''Even a reasonable inference from the evidence may suffice to serve as a basis for the instruction.'' (48 Cal.Jur.2d, Trial § 190, p. 218; *Cooke* v. *Stevens*, 191 Cal.App.2d 457, 460 [12 Cal.Rptr. 828].)

The evidence relating to waiver and estoppel is largely without dispute. Although the policy provided that it automatically lapsed at the end of the grace period for nonpayment of premiums, the Company consistently accepted payments after that time had elapsed.

[2]This application was filled out and signed by the Insured on October 10, 1960. It contains a false representation that he had not had any ailment, disease or symptom thereof and had not consulted a physician since ''the due date of the first premium now unpaid.'' In fact, the Insured had consulted a physician on September 15, 1960 about nervousness, slight headaches and a lump on the left side of his head. The Insured next saw the physician on October 11, 1960 and was told that X-rays taken the previous day showed a defect in the bone of the skull. There is no evidence as to when, if ever, the Insured was told that the lump was cancerous but his wife, appellant herein, was so advised between Thanksgiving and Christmas.

During the one-year period immediately prior to July 27, 1960 *six* of the twelve premiums due during such period were paid and accepted by the Company *after* the expiration of the 31-day grace period. In each of these instances a "late payment offer" was sent to the Insured. In none of such instances had the Company sought to avail itself of the right to forfeit the policy or to require the Insured to make an application for reinstatement.

The Company states: "Respondent admits that it voluntarily waived evidence of insurability during the fifteen day period following the expiration of grace in every case in which a 'late payment offer' was sent." The Company further admits that none of its policyholders knew that it limited this extension to 15 days.

In this case the longest period between the due date of any prior premium and the payment thereof was 48 days, whereas the period involved herein is 65 days, i.e., between July 27 and October 1, 1960.

The printed form of "late payment offer" reads as follows: "The grace period of thirty-one days allowed for payment of the premium on this policy has expired and the policy is no longer in full force. Under these conditions, the Company *usually* requires satisfactory evidence of insurability to reinstate the policy." (Italics ours.)

Then follows a "special offer" to "reinstate the policy WITHOUT evidence of insurability" provided payment is made on or before a date which is inserted in a space on the form. The Company's practice was to calculate this date by adding 15 days to the date upon which the 31-day grace period expired.

The Company's records indicate that a "late payment offer" with respect to the premium due on July 27, 1960 was mailed to the Insured at his San Francisco home address following the expiration of the 31-day period. If the Company followed its usual practice, the expiration date inserted in the notice would be September 11, 1960, which is 46 days after said due date.

The Insured was on the editorial staff of the San Francisco Chronicle. He had accepted a Nieman fellowship at Harvard University. Unknown to the Company, he and his family left San Francisco in mid-August and drove leisurely cross-country to Arlington, Massachusetts, arriving there in mid-September. A friend living in their San Francisco home had

been instructed to hold all mail until their arrival at Arlington.

The mail thus accumulated was apparently forwarded to the Insured in the latter half of September. Included in it was a "late payment offer" and a notice of premium due on September 27, 1960. The Company usually mailed out this type of notice four weeks in advance of the due date. It was therefore probably delivered to the Insured's San Francisco home on or about August 27.

The Insured wrote to the Company from Arlington, enclosing his check dated September 28, 1960, for $19.50, together with the September 27 premium notice and the "late payment offer." This letter was received by the Company at its San Francisco office on October 1, 1960. It reads as follows: "I am sorry that this payment is late. However, we again did not get a bill. We just got the enclosed 'late payment offer.' If we got bills on time, we would pay the premiums on time. I do not want my life insurance to lapse, and prompt billing would insure prompt payment."

On October 5, 1960 the Company replied to the Insured as follows: "This is to acknowledge receipt of your payment of $19.50 for your policy. Your September notice was submitted with your payment; however, our records show that payment is due for July 27, 1960, and accordingly we are enclosing a reinstatement application form which *has to be* completed and signed where indicated and returned to this office. We are enclosing a self-addressed envelope. We would also urge that in order to being [*sic*] your insurance up to date an additional $39.00 should be submitted. This will pay your premiums due for August and September 27." (Italics ours.)

It is evident that the Insured was confused as to which premium he was paying with his check of September 28. The "late payment offer" which accompanied the check was probably the one relating to the premium due on July 27. Yet the Insured noted on his copy of the September 27 premium notice that he had paid it on "9/28/60." The Company introduced this copy in evidence.

The Company's office supervisor testified that it was obvious to him that the Insured was acting under a mistake as to which premiums were due and that "That was why I wrote him the letter [of October 5]."

Despite its awareness of the probability that the Insured believed that his check was in payment of the premium notice

which he enclosed with his letter, the Company deposited the check in its bank account in the same manner as it had deposited the Insured's previous checks.

While the supervisor testified that "We cashed the check, deposited the money, held the money in suspense," the Company never advised the Insured that his money was being so held. So far as the Insured was concerned, all he knew was that the check cleared through his bank and was charged against his account in the same manner as his previous checks to the Company had been.

On October 10, 1960, the Insured replied to the Company's letter of October 5, as follows: "I enclose your letter, on which I am commenting, and I enclose the $39 payment which you requested. However, I am completely puzzled by your billing system. . . . My family's system for paying bills is simple: We pay them when we get them, if we can. If not, we let them slide until we get a second notice. Usually we make it on the first try. . . . When we left San Francisco I had paid the last bill that I received from you. My records show that I sent you checks on June 20 and on July 19. When we arrived at the above address, we paid the first bill that was forwarded to us. This strikes me as fairly prompt payment. Your letter arrived this morning; I enclose the payment you requested. . . . In addition, I enclose the humiliating request for reinstatement that you sent, but *I am bitterly opposed to this sort of thing.* Why should I have to beg for reinstatement of my life insurance when I have missed only one payment—a payment for which I have not got a bill?" (Italics ours.)

The foregoing letter was admitted in evidence without objection, the Company's counsel stating that, "You can put the letter in evidence if you would like." He had objected previously that the letter contained self-serving statements.

The Company replied to this letter on October 17, 1960, stating: "We are sorry for the apparent confusion that is being caused by our billing system. . . ."

As we have seen, the Insured acquiesced in the Company's application of his check to the payment of the July 27 premium. However, he did protest the Company's right to require that he apply for "reinstatement" of his insurance. He had not been required to do so on any previous occasion.

The Company points to the following provision in the

"late payment offer": "By accepting the premium now overdue, the Company does not waive its rights in the event any *future* premium is not paid when due." (Italics ours.)

However, the implication inherent in this provision is that, if the Company *does* accept payment of a certain premium, it thereby waives its right to forfeiture based upon nonpayment of that particular premium.

The fact is that the Company *did* accept payment of the July 27 premium *before* it advised the Insured that the Company would nevertheless require him to execute an application for reinstatement.

We turn now to the law applicable herein. ■ As stated in *Page* v. *Washington Mut. Life Assn.*, 20 Cal.2d 234, 239-240 [125 P.2d 20]: "Forfeitures, particularly in insurance contracts, are not favored. [Citation.] And if reasonably possible in light of the circumstances, the courts will determine that a forfeiture has not occurred or that a waiver or estoppel exists. [Citations.] . . . ■ ■ It is clear that a past course of conduct of acceptance by the insurer of payments of premiums after the grace period may establish a waiver by the insurer of the right to declare a forfeiture for failure to pay premiums exactly at the stipulated time, or the insurer may be said to be estopped to assert the forfeiture where the insured may be said to have been reasonably led to believe that payments made within a reasonable time after the grace period would be acceptable." (See also: *Lincke* v. *Mutual Benefit etc. Assn.*, 76 Cal.App.2d 222, 226 [172 P.2d 912]; *Turner* v. *Redwood Mutual Life Assn.*, 13 Cal.App.2d 573, 579 [57 P.2d 222]; *Vinther* v. *Sunset Mut. Life Ins. Co.*, 11 Cal.App.2d 118, 121-122 [53 P.2d 182]; *Nelson* v. *National Guaranty Life Co.*, 131 Cal.App. 669, 671-672 [21 P.2d 1022].)

In *Scott* v. *Federal Life Ins. Co.*, 200 Cal.App.2d 384, 391-392 [19 Cal.Rptr. 258], the court said: "Waiver and estoppel, however, are frequently applied in insurance law in favor of the insured or the beneficiary under a policy. The courts have generally applied the liberal rule in favor of the insured. . . . Whether a waiver has occurred is usually a question of fact the determination of which, if supported by substantial evidence, will not be disturbed on appeal [citations], unless the only inference which can be drawn from the evidence is to the contrary. [Citations.] The rule is the same for estoppel. [Citations.]" (See also *Posner* v. *Grun-*

*wald-Marx, Inc.,* 56 Cal.2d 169, 189 [49 Cal.Rptr. 297, 363 P.2d 313].)

■ In our opinion the evidence is sufficient to support a finding that the Company waived and is estopped to assert the right to declare a lapse or forfeiture based upon the lateness of the payment of the July 27, 1960 premium.

If the trier of fact makes such a finding, then the Company had no right to require the Insured to execute the application for reinstatement which it sent to him on October 5, 1960.

In *Turner* v. *Redwood Mutual Life Assn.,* 13 Cal.App.2d 573 [57 P.2d 222], the insurance company allowed the insured's son to make out and sign an application for reinstatement of the policy after it had lapsed for nonpayment of premiums. A false statement was made therein that the insured was in good health and had not consulted any physicians. The company had in the past accepted late premium payments on many occasions. The court held that under the facts it ''had waived the right to forfeit the policy because the death payments [premiums] were made after the dates upon which they were due and *the application for reinstatement by the son was not necessary to continue the policy in force.''* (Italics ours.)

Appellant's second contention is that the two-year limitation period in the ''incontestability clause'' contained in the supplementary provision bars the Company, after the expiration of such period, from contesting the truthfulness of the representations made by the Insured in the application for reinstatement which he executed on October 10, 1960.

This contention assumes, for the purpose of presenting it, that the policy and supplementary provision had lapsed and that a reinstatement application was required in order to revive them.

The clause referred to provides that ''This supplementary provision . . . shall be incontestable after it has been in force during the lifetime of the Insured for two years from its date of issue [August 27, 1958], except for nonpayment of premium.''

In *New York Life Ins. Co.* v. *Waterman,* 104 F.2d 990, 992, the court stated: ''We hold . . . that under § 1668 of the Civil Code of California a rescission of a reinstatement procured by fraud is not here prevented by the incontestable clause of the policy'' and that to hold otherwise '' 'would altogether relieve . . . [the insured] of the consequences of his own fraud.' ''

Appellant states that it "must be conceded that the weight of authority in the country is 'to the effect that the incontestable clause runs anew from the date of reinstatement where the insurer's defense is fraud on the part of the insured in the procurement of the reinstatement,'" quoting from the annotation in 134 American Law Reports, at page 1525.

Appellant attempts to draw a distinction between fraud and material misrepresentation of fact. We see no reason to make any such distinction in this case. We therefore hold that the Company was not barred by the incontestable clause from defending against the reinstatement which it allowed in reliance upon the Insured's representations which he made in his application therefor.

The appellant's final contention is that the "Supplementary Provision For Family Income" should have provided for a nonforfeiture benefit as required by section 10160 of the Insurance Code and that she is therefore entitled under section 10167 of that code to the benefit prescribed by subdivision (a) of said section 10160.

Section 10160 of the California Insurance Code reads, in part, as follows: "*Except as provided in Section 10165*, no policy of life insurance shall be issued or delivered in this State unless it shall contain in substance the following provisions, or corresponding provisions which are at least as favorable to the defaulting or surrendering policyholder;

"(a) [Nonforfeiture benefit.] . . . That, in the event of default in any premium payment after premiums have been paid for at least one full year the insurer will grant, upon proper request not later than 60 days after the due date of the premium in default, a paid-up nonforfeiture benefit on a plan stipulated in the policy, effective as of such due date, of such value as may be hereinafter specified. . . ." (Italics added.)

Section 10167 of the Insurance Code provides as follows: "Any policy to which this article is applicable which does not contain a paid-up nonforfeiture benefit shall be construed as granting non-participating paid-up term insurance as a nonforfeiture benefit under subdivision (a) Section 10160."

The Company asserts that the basic policy and the supplementary provision are but "two separate portions of the same insurance policy" within the meaning of section 10160 and that, inasmuch as the basic policy contained a nonfor-

feiture benefit provision, the supplementary provision must therefore be deemed to have complied with said section.

The difficulty with this proposition is that the nonforfeiture benefit provision contained in the policy is expressly excluded from the supplementary provision. We quote from the latter as follows: "The provisions of the policy are hereby referred to and made a part of this supplementary provision except as specifically modified herein and *except* that the provisions in the policy entitled 'Incontestability,' 'Suicide,' '*Nonforfeiture Provision*,' and 'Additional Benefit for Death by Accidental Means' if contained therein, *shall not be applicable to this supplementary provision* nor shall they be affected hereby." (Italics ours.)

Section 10165 of the Insurance Code, at the time of the issuance of the policy, provided in part that section 10160 "shall not apply to . . . any term policy of decreasing amount on which each adjusted premium, calculated as specified in Section 10163, is less than the adjusted premium so calculated on such 15-year term policy issued at the same age and for the same initial amount of insurance. . . ."

The record before us does not contain sufficient information to enable this court to make such a calculation. The parties and the trial court were in apparent agreement that the jury phase of the trial should be completed and that this issue could thereafter be decided by the court.

While the court said, "We can meet that issue later" and counsel for the Company admitted that it "is a very complicated calculation," the record is silent as to what transpired thereafter. It does not appear that any action was taken or ruling made. It is suggested that, on the retrial of the case, the record be completed and the issue be determined.

The judgment is reversed and the order denying appellant's motion for judgment notwithstanding the verdict is affirmed. Appellant to recover costs on appeal.

Shoemaker, P. J., and Taylor, J., concurred.

A petition for a rehearing was denied September 16, 1965, and respondent's petition for a hearing by the Supreme Court was denied October 13, 1965.