Filed 4/27/21

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| TED ANTONOPOULOS et al.,<br><br>        Plaintiffs and Respondents,<br><br>v.<br><br>MID-CENTURY INSURANCE COMPANY,<br><br>        Defendant and Appellant. | A160360<br><br>(Sonoma County<br>Super. Ct. No. SCV263268) |


Plaintiffs Ted and Susie Antonopoulos lost their Santa Rosa home in the 2017 Tubbs fire. They promptly submitted a claim under their homeowner's insurance policy to defendant Mid-Century Insurance Company (Mid-Century), which denied the claim on the ground that the policy had been canceled for nonpayment of premium six days before the fire. Plaintiffs immediately paid the past due premium, and the policy was reinstated. Mid-Century continued to deny the claim, however, taking the position that reinstatement did not retroactively cover the loss that occurred when the policy was out of force.

Plaintiffs sued for breach of contract and breach of the implied covenant of good faith and fair dealing, and the parties filed cross-motions for summary judgment or summary adjudication. Mid-Century argued the undisputed facts showed it did not owe plaintiffs a duty to cover their loss and thus did not breach the insurance contract or the implied covenant of

good faith and fair dealing and could not be liable for exemplary damages. Plaintiffs argued the undisputed facts showed that Mid-Century reinstated the policy without a lapse in coverage and thus owed them a duty to cover their loss. The trial court agreed with plaintiffs, concluding the undisputed facts showed that Mid-Century waived forfeiture of the policy and reinstatement was retroactive with no lapse in coverage. Accordingly, the court granted summary adjudication for plaintiffs on the issue of Mid-Century's duty to provide coverage and denied Mid-Century's motion in its entirety. Pursuant to a stipulation by the parties, judgment was then entered for plaintiffs.

Mid-Century appeals, asserting two fundamental arguments: (1) the loss-in-progress rule precludes coverage for a known loss, so Mid-Century could not, as a matter of law, reinstate the policy retroactively to provide coverage for the loss that occurred while the policy was out of force; and (2) even if Mid-Century *could* have reinstated the policy without a lapse in coverage, the undisputed facts show it did not do so and that it reinstated the policy subject to a lapse of nine days that included the date plaintiffs lost their home.

We reject Mid-Century's first argument. Its second argument hinges on its intent when it reinstated the policy, and as to this, there exists a triable issue of material fact. Thus, we conclude Mid-Century's motion was properly denied but plaintiffs' motion was improperly granted. We therefore affirm in part and reverse in part.

## BACKGROUND

### The Policy, Its Cancellation, and Plaintiffs' Claim

In 2001, plaintiffs Ted and Susie Antonopoulos purchased a home on Vintage Circle in Santa Rosa.[1]  They obtained a homeowner's insurance policy from Mid-Century (the policy) and subsequently renewed the policy on an annual basis for the next 16 years.  Since the inception of the policy, plaintiffs had paid their annual premium in two installments.  Susie handled the bills for the household and was responsible for paying the premium.  She had a history of paying it in an untimely fashion, often allowing the policy to expire and then making a payment at or near the last possible day to maintain the policy without a lapse in coverage.

In February 2017, Mid-Century offered plaintiffs a renewal of the policy, as it had done every year since the policy's inception.  The premium was $1,109.02 for the policy term April 8, 2017, to April 8, 2018.  The attached declaration page identified the Vintage Circle property as the property insured, with property coverage that included the dwelling, separate structures, and personal property, as well as liability coverage.  As in the past, plaintiffs maintained the two-installment option for the renewed policy, with the first installment due on April 8, 2017 and the second installment due four months later, on August 8.

Paragraph 7 of the policy governed cancellation and provided in pertinent part:

"c.  We may cancel this policy by mailing or delivering written notice to you, pursuant to the Policy Notices condition.  The mailing or delivery of it will be sufficient proof of notice.

---

[1] The respondent's brief in this appeal was filed only on Ted's behalf, although Ted and Susie were both plaintiffs below.

3

"We may cancel this policy only for the following reasons:

"(1)   non-payment of premium, whether payable to us or our agent.  We may cancel at any time by notifying you at least 10 days before the date cancellation takes effect . . . ."

On March 9, 2017, Mid-Century sent plaintiffs a bill for the first installment, indicating that $554.51 was due on April 8.  April 8 came and went without Mid-Century receiving payment from plaintiffs.  Accordingly, on April 17, Mid-Century sent them an "Important Expiration Notice" advising that the policy had expired on April 8 due to nonpayment of premium but that they could maintain coverage beyond the expiration date by paying the past due amount by April 25.  The notice also advised that per the two-installment payment plan, the second installment of $559.51 was due on August 8.

On April 25, 2017, plaintiffs paid the first installment.

On July 19, 2017, Mid-Century sent plaintiffs a bill for the second installment, which bill stated in multiple places that payment was due on August 8.  Again, the due date came and went without Mid-Century receiving payment from plaintiffs.  In her deposition, Susie acknowledged she did not make the payment by August 8.  When asked, "What got in the way of making that payment?" she answered, "Cash flow.  Like if I—I didn't think it was due that early, and I didn't have extra money."  She added that she believed the second installment was due October 25—six months after she paid the first installment.

On August 21, 2017, Mid-Century mailed plaintiffs a "Notice of Cancellation of Insurance for Non-Payment of Premium."  The notice identified October 3 as the date of cancellation and stated, "We are cancelling this policy.  Your insurance will cease on the Date of Cancellation shown

4

above. [¶] The reason for cancellation is non-payment of premium. [¶] This is the only notice you will receive." The notice advised that plaintiffs could void the cancellation by paying $559.51, plus a $10.00 late fee, by September 11, a due date referenced five times in the notice of cancellation.[2] Again, September 11 came and went without Mid-Century receiving payment from plaintiffs.

On October 3, 2017, with plaintiffs having failed to pay the second installment, the policy was cancelled.

On October 9, six days after the policy cancellation, plaintiffs' Vintage Circle home was destroyed in the Tubbs fire. Either that day or the next, plaintiffs reported the loss to Mid-Century. Over the next few days, they spoke with multiple individuals at Mid-Century and were told their loss was not covered because their policy had been canceled.

By letter dated October 12, 2017, Mid-Century formally acknowledged receipt of plaintiffs' claim and informed them: "We have completed our coverage investigation and have determined your policy [was] cancelled for non-payment of premium effective October 3, 2017. Therefore, since the policy was not active at the time of this loss, we must respectfully disclaim coverage for this loss."

That same day, plaintiffs made a $569.51 electronic payment to Mid-Century. According to Susie, no one at Mid-Century told them that if they paid the premium at that time, they would receive retroactive coverage

---

[2] Susie denied having received the August 21 notice of cancelation. In support of its summary judgment motion, Mid-Century submitted a declaration of the senior manager of the mail center that handled mailings for Mid-Century. He testified that the notice was processed and mailed on August 21, and he authenticated and described in detail the records that supported his testimony.

for the October 9 loss, but they "believed that was true" based on "[r]ight and wrong." Mid-Century retained the premium and never returned it.

On October 17, 2017, Mid-Century sent plaintiffs a "Home Insurance Reinstatement." It listed the same policy number as the policy cancelled on October 3, but identified the policy's effective date as October 12, 2017, and its expiration date as April 17, 2018—nine days after the original expiration date of the policy. It also listed a prorated premium of $567.82 for the period October 12, 2017, to April 17, 2018. The only change noted in the "Summary of changes" was the renewal date, listing April 8, 2018, as the previous renewal date and April 17, 2018, as the new renewal date.

The attached declaration page also identified October 12, 2017, as the effective date of the policy and April 17, 2018, as the expiration date. It identified the property insured as plaintiffs' Vintage Circle home, listing the same property coverage—including the dwelling, separate structures, and personal property—as the policy renewed on April 8, 2017.

On November 10, 2017, Mid-Century issued a "Home Insurance Policy Reprint." It identified the effective date of the policy as November 9, 2017, the expiration date as April 17, 2018, and a premium of $1,109.02. The reprint asked plaintiffs to "Please take a moment to review the policy documents you have requested," which included a "Declaration page—a summary of your insurance coverages, limits, and deductibles." Unlike the declaration page attached to the October 17 reinstatement notice—and critical to plaintiffs' claim that Mid-Century reinstated the policy without a lapse—the declaration page attached to the reprint listed April 17, 2017, as the effective date and April 17, 2018, as the expiration date. It again identified the property insured as plaintiffs' Vintage Circle home and listed

6

the same property coverage—the dwelling, separate structures, and personal property—as the policy renewed on April 8, 2017.

Unlike the October 17 reinstatement, the policy reprint attached the policy, which contained an integration clause stating in pertinent part, "This policy, the Declarations, the renewal notice and any endorsements include all the agreements between you and us and any of our agents relating to this insurance and the coverages hereunder. The terms, conditions, and exclusions of this policy may not be changed or waived by any oral agreement and may only be changed or waived by endorsement issued by us."

On December 6, 2017, Mid-Century sent plaintiffs a "Home Insurance Coverage Change," extending coverage to an apartment they had rented. It identified the effective date as December 5, 2017, the expiration date as April 17, 2018, the full-term premium as $1,123.56, and a prorated premium for December 5, 2017, to April 17, 2018, of $5.29. The attached declaration page listed the same premium and expiration date, but identified the effective date of the policy as April 17, 2017.

### Plaintiffs' Complaint and the Cross-motions for Summary Judgment or Summary Adjudication

On October 4, 2018, plaintiffs filed a complaint against Mid-Century, asserting causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. They sought damages according to proof, exemplary damages, and attorney fees and costs. Attached to the complaint was the declaration page from the November 10, 2019 policy reprint, reflecting coverage from April 17, 2017, to April 17, 2018.

On August 22, 2019, Mid-Century moved for summary judgment or, in the alternative, summary adjudication. It argued the undisputed facts showed that plaintiffs' policy had been canceled and was out of force at the time of the loss; plaintiffs could therefore not prove the elements of their

7

causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing; and Mid-Century could not be liable for exemplary damages in the absence of liability for actual damages.

The motion was supported by the declaration of Corey Norton, an underwriting specialist and the custodian of underwriting records for Mid-Century. Norton authenticated and described the contents of the insurance records, summarized above, that Mid-Century submitted in support of its motion. He also testified that plaintiffs' October 12, 2017 payment automatically reinstated their policy. Then, as he described it: "[O]n November 10, 2017, Mid-Century issued a document entitled, 'Home Insurance Policy Reprint,' which showed an effective date of November 9, 2017. . . . As Plaintiffs['] policy lapsed for nine (9) days from October 3 to October 12, 2017, Mid-Century, upon receipt of the payment for reinstatement, adjusted the policy effective date from (a) April 8, 2017 to April 8, 2018 to (b) April 17, 2017 to April 17, 2018, thereby adding nine (9) days to the end of the policy term. Plaintiffs still had coverage from April 8, 2017 to April 16, 2017."

Plaintiffs filed their own motion, seeking summary adjudication of Mid-Century's duty to cover the loss of their house. They argued that although Mid-Century purported to have cancelled the policy six days before the fire, immediately after the fire it accepted the premium payment from plaintiffs and reinstated the policy, with the subsequent policy reprint stating on its face that it covered the period April 17, 2017, to April 17, 2018, with no mention of a lapse in coverage.

In support of their motion, plaintiffs relied on many of the same insurance records as Mid-Century. They also submitted deposition testimony

8

of underwriter Norton. The testimony included this exchange between Norton and plaintiffs' counsel:

"Q: What is the significance of a declarations page?

"A: It provides the customer information about their policy.

"Q: In fact the policy is typically attached to the declarations page, or a form is, and there would be endorsements and other materials and that would constitute the policy; is that correct?

"A: Yes.

"Q: So that the forms without a declarations page do not constitute a policy, correct?

"A: The forms without a declaration page.

"Q: The declaration page gives meaning to the policy. This is what the policy contains, right?

"A: Correct."

In other deposition testimony submitted by plaintiffs, Norton confirmed that although there was no longer a house to insure, Mid-Century retained the second installment payment when it received it. He also confirmed that on November 10, 2017, Mid-Century generated a declaration page reflecting the same policy number and same premium as the renewed policy, but with effective and expiration dates that were nine days later than those in the renewed policy. As to Norton's understanding of why those dates were adjusted forward by nine days, this exchange occurred:

"Q: In your research, do you have an explanation why the effective date was selected as nine days later and the expiration date was selected as nine days later?

"A: Yes.

"Q: What is that explanation?

9

"A: It is due to the policy being out of force for nine days in October.

"Q: So what happened was when this policy was reprinted on November 10th, the same policy number was used and the period of time that the policy was, as you put it, 'out of force,' was instead tacked on to the dates in April so as to create a new effective date nine days later? [¶] . . . [¶] And a new expiration date, April 2018, nine days later, correct?

"A: Yeah, the nine days were added on to the end, yes.

"Q: Okay. And that is how, from an underwriting perspective, . . . Mid-Century chose to address this policy, correct?

"A: To account for the days that it was out of force, the dates were adjusted, yes."

After briefing on the motions was complete, the trial court issued a lengthy tentative ruling, granting summary adjudication for plaintiffs on the issue of Mid-Century's duty to cover their loss, and denying Mid-Century's motion in its entirety.

The matter came on for hearing on November 20, following which the trial court adopted its tentative ruling. A written order consistent with the tentative ruling was entered the following day. The order began with a summary of the pertinent facts, which were largely undisputed, and then noted Mid-Century's position that the policy lapsed for nine days but was reinstated upon receipt of the late premium payment, with the expiration date adjusted from April 8 to April 17, 2018, to add nine days to the end of the policy term to account for the days the policy was out of force. Plaintiffs, on the other hand, contended the reinstated policy reflected no lapse in coverage.

Turning to underwriter Norton's testimony regarding the adjusted April 17, 2018 expiration date, the court observed: "Norton's testimony fails

10

to explain why the dates were adjusted by tacking on days rather than expressly acknowledging a lapse in coverage that actually spanned the time when the loss occurred. In *Monteleone v. Allstate Ins. Co.* (1996) 51 Cal.App.4th 509, 516, an automobile insurance case relied on heavily by Mid-Century, '[t]he reinstatement offer stated that appellants were "eligible for reinstatement of your policy, *with a short lapse in coverage*." ' Here, in contrast, there is no such express statement." The court further noted that while the October 17 policy reinstatement identified an effective date of October 12, 2017, and a prorated premium for October 12, 2017, to April 17, 2018, the only change actually noted in the summary of changes was the renewal date, which changed from April 8 to April 17, 2018.

The court next addressed the November 10, 2017 policy reprint, noting that regardless of the October 17 policy reinstatement, the declaration page of the reprint identified the effective and expiration dates as April 17, 2017, and April 17, 2018, respectively. It then quoted the following passage from *Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 14: " 'When the parties to an agreement incorporate the complete and final terms of the agreement in a writing, such an integration in fact becomes the complete and final contract between the parties. Such a contract may not be contradicted by evidence of purportedly collateral agreements. As a matter of law, the writing is the agreement. Extrinsic evidence is excluded because it cannot serve to prove what the agreement was, this being determined as a matter of law to be the writing itself. The rule comes into operation when there is a single and final memorial of the understanding of the parties. When that takes place, prior and contemporaneous negotiations, both oral and written, are excluded.' "

The court rejected Mid-Century's contention that the "loss-in-progress" rule precluded coverage, noting that "Mid-Century has the discretion to waive forfeiture by accepting plaintiffs' premium payment and reinstating the policy with no lapse." In support, it quoted the following passage from *Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, 1066:

" ' " 'The rule is well established that the doctrines of implied waiver and of estoppel, based upon the conduct or action of the insurer, are not available to bring within the coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom, and the application of the doctrines in this respect is therefore to be distinguished from the waiver of, or estoppel to assert, grounds of forfeiture. . . .' " ' (*Aetna Casualty & Surety Co. v. Richmond* (1977) 76 Cal.App.3d 645, 653.) ' "[I]t is the general and quite well settled rule of law that the principles of estoppel and implied waiver do not operate to extend the coverage of an insurance policy after the liability has been incurred or the loss sustained." ' (*Id.* at pp. 652–653; see *Miller v. Elite Ins. Co.* (1980) 100 Cal.App.3d 739, 755 ['Estoppel cannot be used to create coverage under an insurance policy where such coverage did not originally exist']; *Supervalu, Inc. v. Wexford Underwriting Managers, Inc.* (2009) 175 Cal.App.4th 64, 77 ['Supervalu is asserting estoppel to expand coverage under the policies, which is impermissible, rather than to simply avoid a forfeiture of benefits'].) '[T]here is a definite distinction between the waiver of a right to declare a forfeiture, to cancel or to rescind based upon some breach of a condition of the policy on the one hand and the extension of coverage provided by the policy on the other.' (*Insurance Co. of North America v. Atlantic National Ins. Co.* (4th Cir. 1964) 329 F.2d 769, 775.)"

12

Applying those concepts to the facts before it, the court stated that "the issue is not expanded coverage under plaintiffs' policy but whether, as reflected in the November 10, 2017 Policy Reprint, Mid-Century impliedly waived its right to assert grounds for forfeiture of coverage that already existed. Therefore, it appears the loss-in-progress rule has no application under the circumstances."

The order concluded with this:

"In sum, it is undisputed that plaintiffs informed Mid-Century on October 9, 2017 of the loss. [Citation.] It is undisputed that Mid-Century accepted plaintiffs' premium payment thereafter and has never returned it. [Citation.] It is undisputed that Mid-Century issued a Policy Reprint in November 2017 which identified a policy effective date before the date of the fire and made no reference to any lapse in coverage. [Citation.]

"Furthermore, Mid-Century has failed to articulate a coherent explanation for why the 'new' April 17, 2017 effective date demonstrates a lapse of coverage during the nine days in October 2017 when the coverage was claimed to be 'out of force.'

"Finally, there is no basis to conclude that Mid-Century understood that plaintiffs sought anything but reinstatement of the policy *without* a lapse. By basing plaintiffs' premium in the November 10, 2017 Policy Reprint on structures that had been destroyed by fire, it can only be reasonably inferred that Mid-Century had decided to cover plaintiffs' loss."

On December 19, Mid-Century petitioned for writ of mandate. After requesting and receiving opposition from plaintiffs, we denied the petition. (No. A159120.)[3]

---

[3] On January 15, 2020, Mid-Century filed a motion for leave to file a cross-complaint to assert a cause of action for reformation and to amend its

13

In order to expedite appellate review of the trial court's ruling on the coverage issue, the parties agreed to a stipulated judgment for plaintiffs. On May 18, 2020, the trial court approved the stipulated judgment and entered judgment for plaintiffs.

This timely appeal followed.

## DISCUSSION

### Summary Judgment and the Standard of Review

"The rules regarding grant of summary judgment and appellate review thereof are well known. Summary judgment is properly granted where the moving party establishes that no issue of fact exists to be tried. (Code Civ. Proc., § 437c; [citations].) If the trial court determines that no triable issue of fact exists but only one of law, it is the trial court's duty to determine the issue of law. [Citation.]

"Appellate review of summary judgment is limited to the facts presented in documents submitted to the trial court. [Citations.] The appellate court exercises its independent judgment regarding the legal effect of undisputed facts disclosed by the parties' papers, utilizing the same three-step analysis required of the trial court. [Citation.] ' " . . . We first identify the issues framed by the pleadings, since it is these allegations to

answer to plaintiffs' complaint to assert an affirmative defense of reformation. The motion argued that "Plaintiffs' lawsuit is based on nothing more than a scrivener's error which must be reformed to reflect the true agreement of the parties. Due to a mere computer printing/programming error, Mid-Century's system printed two copies of a Declaration Page with the incorrect effective date. . . . [¶] . . . [¶] . . . Plaintiffs' entire lawsuit hangs on this error. The Declaration Page, and subsequent copies, did not accurately reflect the intent of the parties and the agreement between them." The outcome of this motion does not appear in the record, although we assume it was either denied or not ruled on.

14

which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue." ' " (*Monteleone v. Allstate Ins. Co.*, *supra*, 51 Cal.App.4th at pp. 514–515 (*Monteleone*).)

### The Trial Court Properly Denied Mid-Century's Motion But Improperly Granted Plaintiffs' Motion

#### *Mid-Century's Arguments*

Mid-Century contends the trial court erred in deciding the coverage issue in favor of plaintiffs and thus erred in denying its motion for summary judgment and granting plaintiffs' motion for summary adjudication. Mid-Century's arguments run as follows: Plaintiffs' policy was cancelled on October 3, 2017, due to nonpayment of premium.[4] Accordingly, effective October 3, 2017, the policy was out of force and plaintiffs' home uninsured. On October 9, when the policy was out of force, plaintiffs' home was destroyed in the Tubbs fire. Plaintiffs contacted Mid-Century to report the loss but were informed the policy had been canceled for nonpayment of premium. Plaintiffs paid the past due premium, which reinstated the policy prospectively. The reinstatement did not, however, retroactively provide coverage for the loss that occurred while the policy was out of force, for two reasons: (1) the loss-in-progress rule precludes coverage for a known loss, so Mid-Century could not, as a matter of law, retroactively reinstate the policy with coverage for a known loss that occurred while the policy was out of force;

---

[4] Plaintiffs concede they failed to pay the second premium installment and "Mid-Century properly canceled the policy."

and (2) even if Mid-Century *could* have reinstated the policy without a lapse in coverage, the undisputed evidence shows that it did not do so and that it reinstated the policy subject to a lapse of nine days that included the date plaintiffs lost their home.

As to the first claimed reason, Mid-Century misunderstands the law. As to the second, there exists a triable issue of material fact as to whether Mid-Century intended to waive forfeiture of the policy for nonpayment of premium and cover the loss that occurred during the policy's lapse. While this means summary adjudication or judgment for Mid-Century was properly denied, it also means summary adjudication for plaintiffs was improperly granted.

### *The Law Allowed Mid-Century to Retroactively Reinstate the Policy With No Lapse in Coverage*

We begin by rejecting Mid-Century's claim that it could not, as a matter of law, cover the loss of plaintiffs' home because the loss-in-progress rule precluded such coverage. That rule, codified in Insurance Code sections 22 and 250, provides that "when a loss is 'known or apparent' before a policy of insurance is issued, there is no coverage."[5] (*Montrose Chem. Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 690; *Prudential-LMI Com. Ins. v. Superior Court* (1990) 51 Cal.3d 674, 695.) According to Mid-Century, the trial court erroneously framed the issue in terms of forfeiture and waiver, when in fact the loss-in-progress rule governed and compelled a conclusion

---

[5] Insurance Code section 22 states: "Insurance is a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." Section 250 states: "Except as provided in this article, any contingent or unknown event, whether past or future, which may damnify a person having an insurable interest, or create a liability against him, may be insured against, subject to the provisions of this code."

that plaintiffs' loss was not covered by the policy. Mid-Century is incorrect both in its understanding of the doctrines of forfeiture and waiver and its claim that the loss-in-progress rule applied here.

Forfeiture in the insurance context occurs when a party to the insurance contract fails to perform an obligation under the policy and forfeits the benefits of the policy, such as when an insured fails to timely pay its premium, resulting in the lapse of the policy. (See 5 Couch on Insurance (3d ed. 2020) § 76:6 [forfeiture or suspension for nonpayment of premium installment] (Couch); see also *id.*, § 76:2 ["In the absence of a statutory requirement . . ., the contract may provide that, upon the failure to pay a premium or assessment on or before the time provided, the policy shall become void or forfeited, or the obligation of the insurer shall cease, or words to like effect. Under this type of provision, nonpayment works a forfeiture of the contract"]; *Bittinger v. New York Life Ins. Co.* (1941) 17 Cal.2d 834, 840 ["by express provision and in the absence of statutory regulation to the contrary, a life insurance policy may be made immediately forfeitable upon the non-payment of premium"]; *Knarston v. Manhattan Life Ins. Co.* (1899) 124 Cal. 74, 75 [considering whether insurance policy was forfeited by insured's failure to pay premium installment]; *In re First Capital Life Ins. Co.* (1995) 34 Cal.App.4th 1283, 1289 ["policy was forfeited for nonpayment of the premium"]; *McCary v. John Hancock Mut. Life Ins. Co.* (1965) 236 Cal.App.2d 501, 509 [sufficient evidence that insurer waived its right to declare a lapse or forfeiture based on late payment of premium].) An insurer may, however, forgo its right to enforce a provision of an insurance policy providing that nonpayment of premium renders the policy void or causes it to lapse—in other words, it may waive forfeiture. (*Wright v. Paul Revere Life Ins. Co.*

17

(C.D. Cal. 2003) 291 F.Supp.2d 1104, 1112; *Monteleone*, *supra*, 51 Cal.App.4th at p. 517.)

These same rules apply when a loss occurs while a policy was out of force due to nonpayment of premium. In such an instance, an insurer may, upon reinstatement of the policy, agree to cover the loss. Couch addresses this in a section on acceptance and retention of payment "[a]fter loss–[w]ith knowledge of loss":

"There is considerable authority that unconditional acceptance of a premium with knowledge that a loss under the policy has occurred waives any default for nonpayment. Where, however, the premium is earned, and forfeiture occurs before the loss, taking and retaining the premium do not effect a waiver of the forfeiture or constitute evidence tending to show a waiver.

"These seeming contradictory results may be explained by more recent authority to the effect that whether an insurer's acceptance of an overdue premium after loss has occurred acts to preserve coverage is ordinarily a question of the insurer's intent in accepting the premium, and whether that intent has been adequately conveyed to the insured. Obviously, the insurer cannot claim that the payment was meant to operate prospectively only where it has issued a receipt indicating that payment was for renewal of the policy and not reinstatement.

"By accepting the payment of a premium note with full knowledge of the fact that it is overdue and unpaid at the time of loss, the insurer likewise waives its right to insist upon its exemption from liability, provided that there is no stipulation that the premium shall be considered as earned in case of default in payment at maturity.

18

"**Observation**:

"The foregoing examples highlight the need for all parties in these situations to clearly communicate their intentions.  Unfortunately for the insurer, these issues will be decided by a jury composed of the insured's peers which creates its own dangers for the insurer." (Couch, *supra,* § 78:48, fns. omitted.)

In support, Couch cites no fewer than 16 cases recognizing that an insurer can decide to cover a loss that occurred when a policy was out of force due to nonpayment of premiums.  (See, e.g., *American Const. Corp. v. Philadelphia Indem. Ins. Co.* (D. Ariz. 2009) 667 F.Supp.2d 1100 [if insurer accepts an insured's late renewal payment with full knowledge that the insured already has a claim, insurer must either notify the insured or issue a refund within a reasonable time, or else the insurer waives the right to insist upon forfeiture of the policy based on nonpayment]; *Central Nat'l. Ins. Group of Omaha v. Grimmett* (Ala. 1976) 340 So.2d 767 [where insurer accepted payment for premium on lapsed policy with knowledge that accident occurred during period of lapse, insurer could apply premium from date it was received forward only if insurer clearly conveyed to insured its intent to do so before premium payments were accepted]; *Van Hulle v. State Farm Mut. Auto. Ins. Co.* (Ill. 1968) 241 N.E.2d 320, judgment aff'd, 254 N.E.2d 457 (1969) [forfeiture of a policy for nonpayment of premium may be waived after loss by acceptance of the past due premium with notice of the loss, particularly if the premium is tendered with the understanding that acceptance thereof would operate as a continuation of coverage during the period when the accident occurred]; *Enfinger v. Order of United Commercial Travelers of America* (Fla. 1963) 156 So.2d 38 [forfeiture was waived where local lodge received and supreme lodge retained, with knowledge of the facts, assessments made

19

after the death of a member]; see also *Amos v. Allstate Ins. Co.* (Alaska 2008) 184 P.3d 28, 35 ["unconditional acceptance of past due premiums reinstates coverage, presumably with no time gap [but] acceptance of past due premiums may be conditioned on an effective date for renewed coverage that leaves a gap in coverage"].)

While Couch cites no California authorities on point, *Monteleone*, *supra*, 51 Cal.App.4th 509—on which Mid-Century heavily relies—confirms that California law is in accord. There, the Monteleones failed to timely pay the premium to renew their automobile insurance policy. Allstate sent a notice advising that their coverage had terminated but they were eligible for reinstatement of the policy "with a short lapse in coverage" if they paid the first premium installment by January 7. On December 31, Mrs. Monteleone called their Allstate agent and left a message that they wanted to add their daughter to the policy. On January 3, the daughter was involved in an automobile accident, and the next day, Mrs. Monteleone mailed the installment payment. Allstate received the payment on January 6 and reinstated the policy effective January 4, the date the premium payment was mailed. On January 7, Allstate issued an amended declaration page confirming that the daughter had been added to the policy and reflecting a policy period of December 21 through June 21, with no mention of a lapse. The declaration page stated that the policy was issued January 7 and showed that the policy period had been amended January 5. Several weeks later, the Monteleones received a credit representing a reduction in premium for the period the policy was out of force. (*Id.* at pp. 513–514.)

Allstate denied coverage for the January 3 accident, and the Monteleones sued for breach of contract. Allstate moved for summary judgment on the ground that it had no duty to provide coverage because the

20

policy was not in force on the date of the accident. The trial court granted the motion. (*Monteleone, supra*, 51 Cal.App.4th at p. 514.) The Monteleones appealed, arguing summary judgment was error because "Allstate had renewed the policy without lapse, had collected the entire premium without deduction or offset for a lapse, had waived its right to claim lapse and is estopped from so asserting, and that the loss in progress rule is inapplicable to this case." (*Id.* at p. 513.) The Court of Appeal affirmed, rejecting, among other things, the Monteleones' "strained interpretation" of the amended declaration page that indicated the policy period was December 21 to June 21. The court found it significant that the reinstatement offer specified restatement would be "with a short lapse in coverage" (*id.* at p. 516), and it concluded Allstate's conduct did not waive forfeiture. (*Id.* at p. 517.)

At no point in the court's analysis did it suggest coverage was unavailable as a matter of law because the loss preceded reinstatement of the policy. To the contrary, it recognized that the loss-in-progress rule did not bar coverage: "The question is not whether the loss-in-progress rule would defeat coverage, but whether Allstate was willing to assume responsibility for a known risk of damages incurred during the period in which the previous coverage had lapsed. Allstate was not willing and lost no time in informing appellants that it would not insure or defend for that loss." (*Monteleone, supra*, 51 Cal.App.4th at pp. 518–519.) Elsewhere the court recognized that Allstate had the discretion to reinstate the policy without a lapse, despite the accident that occurred when the policy was out of force. (*Id.* at p. 517.)

Were Mid-Century's position correct—that an insurer cannot as a matter of law cover a known loss that occurred during a lapse in a policy—the analysis in *Monteleone* would have been different and would not have necessitated an examination of Allstate's intent regarding the retroactivity of

the reinstatement. And consistent with the principles articulated in *Monteleone*, the trial court here correctly framed the fundamental issue presented by the cross-motions as whether Mid-Century "waived its right to assert grounds for forfeiture of coverage that already existed."

Despite the foregoing, Mid-Century repeatedly insists there could be no coverage because the loss-in-progress rule, not forfeiture or waiver, applied to these circumstances. But the loss-in-progress rule did not apply for a simple reason: plaintiffs' loss did not occur before the policy was issued, which occurred when the policy renewed on April 8, 2017—six months before the loss. What incurred on October 12 was *reinstatement* of the prior policy. Our Supreme Court explained this distinction in *Kennedy v. Occidental Life Ins. Co.* (1941) 18 Cal.2d 627, 630: "[R]einstatement under a policy such as is present in this case does not involve the formation of a new contract. By the terms of the policy the insured is given a right to reinstatement after lapse upon compliance with certain conditions. During the period in which reinstatement is possible the policy is not void but merely suspended." (Accord, *Ryman v. American Nat'l. Ins. Co.* (1971) 5 Cal.3d 620, 631.) Here, the cancellation notice stated plaintiffs could "void this cancellation"—not "obtain a new policy"—by paying the past due installment. The October 17, 2017 "Home Insurance Reinstatement" was consistent with this, as it maintained the same coverage for the dwelling, separate structures, and personal property on Vintage Circle. If this were a newly issued policy, surely the terms of coverage and the premium would have been adjusted to reflect that the Vintage Circle dwelling, separate structures, and personal property no longer existed.

Regarding the doctrines of waiver and forfeiture, Mid-Century submits they "have no place in the analysis of this lawsuit." Its argument, lengthy as

it is, is unavailing. According to Mid-Century, "there can be no waiver of contractual rights when there is no contract," as it claims was the case when the policy lapsed. This argument misses the point, as that is the very essence of the waiver doctrine in this context: it allows the insurer to forgive the lapse of the policy that occurred due to nonpayment of premium.

Mid-Century also misconceives the concept of forfeiture, making this curious assertion: "Generally, forfeiture is defined as a 'deprivation or destruction of a right in consequence of the nonperformance of some obligation or condition.' (*Chase v. Blue Cross of California* [(1996)] 42 Cal.App.4th [1142,] 1149.) In the insurance context, 'forfeiture' is 'the assessment of a penalty against the insurer for either misconduct or failure to perform an obligation under the contract.' (*Ibid.* at p. 1151.) Forfeiture has nothing whatsoever to do with cancellation of a policy for nonpayment of premium."

*Chase v. Blue Cross of California*, *supra*, 42 Cal.App.4th 1142 involved an insurer's appeal from the denial of its petition to compel arbitration. (*Id.* at p. 1148.) The Court of Appeal recognized that an insurer can lose a contractual right in three different ways, including forfeiture, which, in the context there, meant "the assessment of a penalty against the insurer for either misconduct or failure to perform an obligation under the contract." (*Id.* at p. 1151.) From that, Mid-Century apparently extrapolates that forfeiture is *only* ever a penalty assessed against an insurer and "has nothing whatsoever to do with cancellation of a policy for nonpayment of premium." This is incorrect. As already detailed above, an insured may forfeit the benefits of an insurance policy by failing to perform an obligation under the contract, such as failing to pay the premium.

In sum, no matter how many times Mid-Century repeats its mantra that there could be no coverage as a matter of law because the policy was not in force at the time of the loss, the law is to the contrary. With this, we turn to the question of whether Mid-Century retroactively reinstated the policy, which is the second basis for it argument that it—not plaintiffs—should have prevailed on the coverage issue.

### *There Exists a Triable Issue of Material Fact Regarding Mid-Century's Intent When It Reinstated the Policy that Precludes Summary Adjudication for Either Party*

Having concluded that Mid-Century *could* have retroactively reinstated the policy knowing plaintiffs suffered a loss during the period the policy was out of force, the question becomes whether Mid-Century did in fact do so. The trial court concluded from the evidence that it could "only be reasonably inferred that Mid-Century had decided to cover plaintiffs' loss." As to such inference, we have a number of observations. First, in ruling on a summary adjudication or judgment motion, the trial court must view the evidence and inferences drawn from it in the light most favorable to the opposing party. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) Second, "summary judgment shall not be granted by the court based on inferences reasonably deducible from the evidence if contradicted by other inferences or evidence that raise a triable issue as to any material fact." (Code Civ. Proc., § 437c, subd. (c).) And third, on appeal, we must draw all reasonable inferences in favor of the party against whom summary adjudication was entered. (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 197.)

With these principles in mind, we reach a different conclusion than the trial court—that the evidence and reasonable inferences raise a triable issue as to whether Mid-Century intended to retroactively reinstate the policy

24

without a lapse.  This precludes summary adjudication for Mid-Century—and for plaintiffs.

" ' "Waiver is the intentional relinquishment of a known right after knowledge of the facts." [Citations.]  The burden . . . is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and "doubtful cases will be decided against a waiver" [citation].' . . .  The waiver may be either express, based on the words of the waiving party, or implied, based on conduct indicating an intent to relinquish the right." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31; accord, *Intel Corp. v. Hartford Acc. & Indem. Co.* (9th Cir. 1991) 952 F.2d 1551, 1559 ["California courts will find waiver when a party intentionally relinquishes a right, or when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished"]; *Klotz v. Old Line Life Ins. Co. of Am.* (N.D. Cal. 1996) 955 F.Supp. 1183, 1186.)  Our Supreme Court has recognized that these general waiver rules apply in the context of an insurer relinquishing its right to deny coverage.  (*Waller*, *supra*, at p. 31.)  The *Monteleone* court recognized the same:  "Waiver requires the insurer to intentionally relinquish its right to deny coverage.  [Citation.]  Alternatively, a party may be found to have waived a right ' ". . . when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." ' " (*Monteleone*, *supra*, 51 Cal.App.4th at pp. 517–518, quoting *Waller*, *supra*, 11 Cal.4th at pp. 31, 33–34.)

Specifically as to an insurer's waiver of forfeiture for nonpayment of premiums, Couch states:  "As waiver is primarily a question of whether the insurer manifested an intent to surrender or forego its rights, it is not

25

necessary that the insured be misled for a waiver to occur. Where, however, the insurer's intent to waive the breach of the policy is not clearly manifested, the question becomes one of determining whether a reasonable person in the position of the insured would have believed that a waiver was intended by the insurer. [¶] Observation: [¶] In these cases the issue will generally be submitted to a jury which invariably will attempt to step in the shoes of the insured who is usually one of their peers. The dangers should be obvious to the insurer." (Couch, *supra*, § 78:3.)

Plaintiffs' argument, and the trial court's conclusion, that Mid-Century waived forfeiture of the policy relied largely on the declaration page attached to the November 10, 2017 policy reprint. That page identified the policy effective and expiration dates as April 17, 2017, and April 17, 2018, with no mention of the nine-day lapse in coverage. And it identified the property insured as the Vintage Circle address and the property covered as the dwelling, separate structures, and personal property. Norton testified that the declaration page "provides the customer information about their policy" and "gives meaning to the policy [and] is what the policy contains . . . ." Although the court did not cite the integration clause in the policy, it noted the effect of such a clause—that the writing "becomes the complete and final contract between the parties."

Also supporting plaintiffs' position was the October 17, 2017 policy reinstatement, which, although it identified an effective date of October 12, 2017 and a prorated premium for October 12, 2017, to April 17, 2018, listed only a new renewal date of April 17, 2018, in the summary of changes. Like the November 10 policy reprint, the declaration page attached to the October 17 reinstatement indicated coverage was for structures and personal property that had been destroyed by fire.

Finally, with knowledge of the October 9 loss, Mid-Century accepted plaintiffs' payment, reinstated the policy, never advised that reinstatement was subject to a lapse, and never returned any or all of the premium.

This evidence indeed supports an inference, as the trial court concluded, that Mid-Century had decided to reinstate the policy with retroactive coverage for the period the policy was out of force. But that is not the only reasonable inference, as there is also evidence suggesting otherwise. Most fundamentally, the October 17 reinstatement notice and its attached declaration page both identified the effective date as October 12, 2017, the date plaintiffs belatedly paid the second installment. The declaration page also listed a prorated premium for the period October 12, 2017 to April 17, 2018. The prorated premium was less (albeit nominally) than the second installment that was due prior to the cancellation. Nowhere on either document—or anywhere else for that matter—did Mid-Century communicate to plaintiffs that reinstatement was retroactive. As Mid-Century notes, "[N]othing in the documents that [plaintiffs] rely on states that coverage was applied retroactively or that coverage was reinstated without a lapse from the October 3, 2017, date of cancellation to the October 12, 2017, date of reinstatement. Indeed, at all relevant times, [Mid-Century's] position was that the policy was out of force and there was no coverage for the loss."

Both sides submit that underwriter Norton's testimony supports their interpretation, but his testimony actually confirms that there is a question of fact as to Mid-Century's intent in reinstating the policy. According to Mid-Century:

"Mr. Norton clearly testified that the policy was '*out of force for nine days in October.*' [Citation.] Because the dollar amount of the premium to be paid ($1,109.02) provided coverage for one year, and the policy was out of

force for nine days, the end of the term had to be extended for nine days (from April 8, 2018, to April 17, 2018) to provide the insureds with the benefit of what they paid for. As Mr. Norton put it, Mid-Century chose to address this policy in this manner 'to account for the days that *it was out of force*, the dates were adjusted, yes.' [Citation.]

"This did not mean, however, that there was suddenly no coverage for the period of April 8, 2017, to April 17, 2017, just because a later policy reprint moved the inception date forward to account for a one-year term. Indeed, if the Antonopouloses had been sued for a covered loss under the policy that occurred between April 8, 2017 and April 17, 2017, Mid-Century would have defended and indemnified them (barring unrelated coverage issues). But they can't have it both ways, as that would be unfair to Mid-Century, which did not receive premium for a policy period of one year and nine days."

But as the trial court correctly pointed out, "Norton's testimony fails to explain why the dates were adjusted by tacking on days rather than expressly acknowledging a lapse in coverage that actually spanned the time when the loss occurred." His testimony that Mid-Century accounted for the days the policy was out of force by adding nine days on to the end of the policy was also undermined by the fact that Mid-Century did not merely extend the expiration date by nine days but also advanced the effective date by nine days, thereby shifting the entire policy year ahead by nine days. This is inconsistent with Mid-Century's claim that the new expiration date demonstrated that the policy was reinstated subject to a nine-day lapse rather than retroactively.

At the same time, plaintiffs' interpretation of Norton's testimony makes little sense. According to them, he testified that the November 10 policy

28

reprint reflected a "deliberate decision [by Mid-Century] to issue a policy that closed any gap in coverage on that terrible day" and "that any gap in coverage was treated as a delay placed at the *end* of the policy, not at the time of the fire." We are hard pressed to understand how Norton's testimony suggests Mid-Century placed the nine-day lapse at the end of the policy period. But in any case, his testimony is one piece of the conflicting evidence on Mid-Century's intent when it reinstated the policy.

*Monteleone*, *supra*, 51 Cal.App.4th 509, in which the court granted a motion for summary judgment in favor of the insurer under, as Mid-Century would have it, "nearly identical circumstances," does not persuade us that the material facts were undisputed and supported summary judgment for Mid-Century.

As detailed above, Mrs. Monteleone failed to pay the premium on their Allstate automobile insurance policy, the policy was canceled, the daughter was in a car accident, Mrs. Monteleone mailed the premium, and Allstate reinstated the policy effective the date she mailed the premium. Allstate then issued an amended declaration page and identification cards reflecting a policy period that was effective before the date of the accident with no mention of a lapse in the policy. (*Monteleone*, *supra*, 51 Cal.App.4th at pp. 513–514.) In these regards, *Monteleone* and this case are indeed similar. However, there is a significant distinction—a distinction, we note, Mid-Century fails to even acknowledge—that supported summary judgment for Allstate: after the Monteleones neglected to pay the premium by the due date, Allstate sent a notice stating, "Your insurance coverages have terminated. You are eligible for reinstatement of your policy, *with a short lapse in coverage*." (*Id.* at p. 513, italics added.) Mid-Century's notice of cancellation contained no such language. Also significant in *Monteleone* was

29

that several weeks after issuing the amended declaration page, Allstate sent the Monteleones a refund for the period the policy was out of force. (*Id.* at pp. 516–517.) Mid-Century gave plaintiffs no such refund here, choosing instead to adjust the policy dates in a fashion that created confusion. Thus, while the facts of *Monteleone* may have lent themselves only to the conclusion that Allstate did not breach its contractual duty to its insureds, the evidence here does not lend itself to the same conclusion.

## DISPOSITION

The order denying summary judgment or summary adjudication for Mid-Century is affirmed. The order granting summary adjudication for plaintiffs on the issue of Mid-Century's duty to cover their loss is reversed. The stipulated judgment for plaintiffs shall be set aside. Each side shall bear its own costs on appeal.

_____

Richman, Acting P.J.

We concur:


_____

Stewart, J.


_____

Miller, J.

*Ted Antonopoulos et al. V. Mid-Century Insurance Company*
(A160360)

| | |
|---|---|
| Trial Court: | Sonoma County Superior Court |
| Trial Judge: | Honorable Elliot L. Daum |
| Attorney for Plaintiffs and Respondents, Ted Antonopoulos et al.: | Pillsbury & Coleman, LLP, Philip L. Pillsbury, Jr., Eric K. Larson |
| Attorneys for Defendant and Appellant, Mid-Century Insurance Company: | Hansen, Kohls, Sommer & Jacob, LLP, Daniel V. Kohls, Leighton R. Koberlein; BHC Law Group, LLP,  Susan P. Beneville, Julie Hayashida |